**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 28, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

COLLIE M. TRANT,

      Plaintiff - Appellant,

v.

STATE OF OKLAHOMA; BOARD
OF MEDICOLEGAL
INVESTIGATIONS; OFFICE OF THE
CHIEF MEDICAL EXAMINER;
DEWAYNE ANDREWS, in his
individual and official capacities;
DOUGLAS STEWART, in his
individual and official capacities;
ROCKY McELVANY, in his
individual and official capacities; C.
MICHAEL OGLE, in his individual
and official capacities; CHARLES
CURTIS, in his individual and official
capacities; KARLIS SLOKA, in his
individual and official capacities;
CHRIS FERGUSON, in his individual
and official capacities; SHANDA
McKENNY, in her individual and
official capacities; CHEROKEE
BALLARD, in her individual and
official capacities; SANDRA
BALZER, in her individual and
official capacities; TOM JORDAN, in
his individual and official capacities,

      Defendants - Appellees.

No. 13-6009

*Submitted on the Briefs*

R. Scott Adams, Adams & Associates, Oklahoma City, Oklahoma, and Carl Hughes, Hughes & Hughes, Edmond, Oklahoma, for Appellant.

Kevin L. McClure, Assistant Attorney General, Litigation Division, Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, for Appellee State of Oklahoma, and Dixie L. Coffey and Ronald E. Baze, Assistant Attorneys General, Litigation Division, Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, for Appellees Ferguson, Stewart, McElvany, Ogle, McKenny, Sloka, Curtis, Jordan, Ballard, and Balzer.

Before **HARTZ**, **TYMKOVICH**, Circuit Judges, and **JACKSON**[*], District Judge.

**TYMKOVICH**, Circuit Judge.

Dr. Collie Trant is the former Chief Medical Examiner for the State of Oklahoma. Trant joined the Office of the Chief Medical Examiner at a time the office was recovering from a series of public scandals. But Trant soon lost the confidence of the Oklahoma Board of Medicolegal Investigations, to whom he reported, and was terminated. Trant filed suit in Oklahoma state court alleging a number of claims under federal and state law in connection with his tenure and

---

[*] The Honorable R. Brooke Jackson, United States District Court Judge, District of Colorado, sitting by designation.

termination. Oklahoma subsequently consented to removal of the case to federal court.

The district court granted summary judgment in favor of the defendants on Trant's First Amendment retaliation claims brought under 42 U.S.C. § 1983. The district court dismissed for lack of standing Trant's claim seeking a declaratory judgment the Board violated the Oklahoma Open Meetings Act. The court also dismissed Trant's breach of implied contract claim for failure to state a claim under Oklahoma law.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's grant of summary judgment in favor of defendants on Trant's First Amendment claims and its dismissal of Trant's breach of implied contract claim. We REVERSE the district court's dismissal of Trant's declaratory judgment claim and REMAND for further proceedings consistent with this opinion.

# I. Background

## A. Factual Background

Oklahoma's Chief Medical Examiner conducts crime scene investigations and autopsies and directs the Office of the Chief Medical Examiner (OCME). The Board of Medicolegal Investigations oversees the operation of the OCME. The Chief Medical Examiner serves "at the pleasure of the Board," 63 Okla. Stat. § 934, and is directly responsible to the Board for the performance of his statutory duties. *Id.* § 935.

The Board hired Trant in May 2009. Trant took responsibility for the OCME at a difficult time for the agency. Shortly before Trant's hiring, the OCME endured a serious sexual misconduct scandal, which resulted in a grand jury investigation and charges of sexual battery brought against the OCME's former chief investigator. The grand jury found "gross incompetence" on the part of the OCME's prior leadership. Around the same time, the OCME lost its accreditation with the National Association of Medical Examiners, which it had held for eighteen years. OCME employees brought sexual harassment claims against the OCME, some of which remained unresolved at the time Trant joined the office.

Trant alleges that early in his tenure he discovered improprieties with the grand jury investigation into the OCME employees' sexual harassment claims. Specifically, he believed that an investigator was encouraging employees to make false sexual harassment allegations and to inflate overtime claims. Based on his suspicions, he asked the Oklahoma Attorney General's Office to review the grand jury investigation.

During this time, the Board adopted a plan to repair the agency's damaged reputation and improve its internal operations. As part of these efforts, the Board created a new position of Chief Administrative Officer (CAO) and delegated most of the OCME's administrative duties to the CAO.

Upon the Board's recommendation, Trant hired Tom Jordan as the first

-4-

CAO in December 2009. A conflict soon developed between them. Trant objected to Jordan's meetings with OCME employees held without Trant's knowledge. In late January 2010, Trant informed Jordan that he was taking over supervision of two division directors that answered to Jordan under the Board's reorganization. Jordan informed Trant that he felt he did not have Trant's support to carry out his duties under the reorganization and that Trant was not effectively managing the OCME.

Soon after, Jordan expressed that he was considering resigning, which came to the attention of some Board members. Three Board members conducted an informal meeting with Trant and Jordan to address the conflict between them. No resolution was reached. On January 28, 2010, Trant sent an email to Dewayne Andrews, the Chairman of the Board. In the email, Trant expressed his belief that the Board was considering terminating either him or Jordan, detailed his conflict with Jordan, and revealed for the first time that he had documentation showing that there were serious improprieties in the grand jury investigation of the sexual misconduct allegations at the OCME. Later that morning, the Board released a notice and agenda for a meeting to be held on February 1. The agenda listed "Proposed Executive Session for Discussion and possible action on the employment of Dr. Collie Trant." App. 1533. On January 29, Trant forwarded the emails he had pertaining to the grand jury investigation to several OCME employees, including one of the agency's investigators.

At the February 1 meeting, the Board went into a closed executive session. Trant spoke for approximately twenty minutes about matters related to the alleged improprieties with the grand jury investigation. Trant also stated that he would retain counsel to report alleged wrongdoing on the part of the Board during the grand jury investigation. He did not stay for the remainder of the meeting. Jordan then expressed his negative opinions about Trant, and the Board heard allegations that Trant had sexually harassed Cherokee Ballard, an OCME employee.[1] The Board discussed whether Trant's comments amounted to sexual harassment and how to respond to the allegations.

The Board then returned to open session and voted unanimously to place Trant on administrative leave with pay "pending investigation into concerns raised during the Executive Session." App. 3802. According to the terms of his administrative leave, Trant's sole point of contact for medical matters was Dr. Eric Duval. Any non-medical matters were to be directed to the Board members. Board member Chris Ferguson communicated these terms to Trant. Trant nevertheless tried to contact three OCME employees, including Ballard.

The next day, the media reported Trant's suspension and his allegations regarding the grand jury investigation. On February 3, the Board provided notice of another meeting for February 5. On February 4, newspapers reported that

---

[1] Trant admits to calling Ballard an expletive in the presence of another OCME employee and commenting to Ballard on the size of her breasts.

-6-

Trant's attorney stated that Trant would report the emails pertaining to the grand jury investigation to outside authorities. At the February 5 meeting, the Board went into executive session and upon returning to open session, terminated Trant. According to the notes of Sandra Balzer, an assistant Attorney General who represented the Board, the Board discussed approximately a dozen reasons for Trant's termination, including his threat to sue the Board. Other reasons were Trant's contact with Ballard and OCME employees in violation of the terms of his administrative leave, the inappropriate remarks pertaining to Ballard, and the management issues at the OCME.

### B. Procedural Background

Trant filed suit in Oklahoma state court, alleging sixteen state and federal law claims against the state, the Board members, and certain OCME employees. Ballard removed the suit to federal court, and the state consented to removal. The district court granted the defendants' motion to dismiss Trant's First Amendment and Due Process Clause claims, holding that the defendants were entitled to qualified immunity. Trant appealed the dismissals.

We reversed the district court's dismissal of Trant's First Amendment claim and affirmed its dismissal of his Due Process Clause claims. *See Trant v. Oklahoma*, 426 F. App'x 653 (10th Cir. 2011) (*Trant I*). We held that two of Trant's statements were outside the scope of his employment and thus may be the bases for a First Amendment retaliation claim. These statements were (1) Trant's

threat to retain counsel to report any wrongdoing by Board members related to the grand jury investigation; and (2) counsel's statement about the possibility that Trant would reveal the grand jury emails to outside authorities.

On remand, the defendants renewed their motions to dismiss Trant's remaining state law claims and moved for summary judgment on his First Amendment claims. The district court disposed of the claims in two separate orders. *See Trant v. Oklahoma*, 874 F. Supp. 2d 1294 (W.D. Okla. 2012); *Trant v. Oklahoma ex rel. Bd. of Medicolegal Investigations*, No. CIV-10-555-C, 2012 WL 6690358 (W.D. Okla. Dec. 21, 2012). The district court dismissed Trant's claims for breach of implied contract and mandamus relief. *Trant*, 874 F. Supp. 2d at 1301–03, 1306 n.9. The court also dismissed Trant's claim for a declaratory judgment that the Board violated the Open Meetings Act. *Trant*, 2012 WL 6690358, at *4. The court reasoned that Trant's termination was not redressable by the court and he therefore lacked standing to bring the declaratory judgment action. The court also granted summary judgment for the defendants on Trant's First Amendment claims and remanded the remaining state law claims to state court. *Id.* at *10. This appeal followed.

## II. Analysis

Trant seeks reversal of the district court's decisions on his First Amendment, declaratory judgment, mandamus, and breach of implied contract claims. We agree with the district court on the federal claims and most of the

state claims, but we conclude that Trant might have standing to pursue his declaratory judgment claim for a violation of the Oklahoma Open Meetings Act, assuming the district court retains supplemental jurisdiction on remand.

### A. First Amendment Claims

#### 1. Retaliation Claim Against the Board

Trant argues that the Board terminated him in retaliation for his and his counsel's statements threatening to reveal information related to the grand jury investigation to authorities. The familiar *Garcetti/Pickering*[2] analysis governs First Amendment retaliation claims. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007). This test comprises five elements:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury. *Id. But see Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 483–84 (10th Cir. 2011) (affirming summary

---

[2] *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

-9-

judgment for defendants where plaintiff could not meet evidentiary burden at the fourth step).

At the first step, our previous opinion in this case concluded that two of Trant's statements were not made pursuant to his official duties—his statements about retaining counsel and his counsel's statements about reporting alleged wrongdoing surrounding the grand jury investigation—and thus triggered First Amendment protection. *See Trant I*, 426 F. App'x at 660–61. We therefore proceed to the next four steps of the inquiry.

At the second step, we determine whether the speech is a matter of public concern. *Brammer-Hoelter*, 492 F.3d at 1202. Speech is a matter of public concern if it is "of interest to the community," *id.* at 1205, and we "focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000). "Statements revealing official impropriety usually involve matters of public concern." *Brammer-Hoelter*, 492 F.3d at 1205. The district court assumed, without deciding, that Trant's speech involved a matter of public concern, and we agree. Irregularity in a grand jury investigation into a public agency's alleged misconduct is a matter of public concern. Although Trant's speech may have been motivated in part by his riff with the Board, the subject matter of the dispute concerned misconduct in a grand jury investigation involving official impropriety,

-10-

which is undoubtedly of interest to the community.

Next, we determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Id.* at 1203. The only public employer interest that outweighs the employee's free speech interest is "avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Id.* at 1207 (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989)). When performing this step's balancing test,

> the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The employer's interest in regulating an employee's speech varies "with the extent of authority and public accountability the employee's role entails." *Id.* at 390; *see also  Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995). The district court held that, although the Board showed that many of Trant's activities were disruptive, the Board did not meet its burden in showing that Trant's protected speech was itself disruptive.

Because Trant's claims can be resolved at a later step in the analysis, we will assume that the district court reached the correct conclusion. We note, however, that the Board was not required to show that the speech had in fact disrupted the OCME's internal operations and employment relationships. It needed only to establish that the speech could *potentially* become so disruptive to the OCME's operations as to outweigh Trant's interest in the speech. *See Connick v. Myers*, 461 U.S. 138, 151–52 (1983).

At the fourth step, if the employee's interest in the speech outweighs the state's, the employee must show that the speech was a "substantial factor or a motivating factor in a detrimental employment decision." *Brammer-Hoelter*, 492 F.3d at 1203. Even assuming the fourth step favors Trant, —that the Board terminated Trant at least partially because of his statement about hiring counsel—he does not show a fact dispute at the fifth step.[3]

At the fifth step, if the employee establishes that his or her protected

---

[3] The district court did not address whether Trant's counsel's statement about reporting wrongdoing to outside authorities was a motivating factor in his termination. Based on our review of the record, we conclude there is no dispute of material fact. Trant did not introduce any evidence that the Board members were aware of these statements at the time it scheduled the February 5 meeting or at the meeting itself. Trant can only argue that there was temporal proximity between his counsel's statement and Trant's termination. But this does not create a genuine issue of material fact as to whether Trant's counsel's statement was a motivating factor in his termination. *See Butler v. City of Prairie Village*, 172 F.3d 736, 746 (10th Cir. 1999) ("The mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive.").

speech was a motivating factor in the adverse employment decision, "the burden then shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity." *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998) (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)). This inquiry, also known as the *Mt. Healthy* analysis, arises from the Supreme Court's recognition that a "rule of causation which focuses solely on whether protected conduct played a part" in an adverse employment decision "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy*, 429 U.S. at 285; *see also id.* at 286 ("But [a borderline or marginal] candidate ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."); *Hartman v. Moore*, 547 U.S. 250, 260 (2006) (discussing *Mt. Healthy*) ("If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind."); *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359 (1995) ("We held [in *Mt. Healthy*] that if the lawful reason alone would have sufficed to justify the firing, the employee

could not prevail in a suit against the employer.").

The district court granted summary judgment for the Board because it found the Board would have fired Trant regardless of his protected speech based on the allegations of sexual harassment and insubordination after his suspension. Trant acknowledged the incidents underlying the court's holding, but he disputed that they amounted to sexual harassment or insubordination. The district court held, "Despite arguing that these grounds are merely pretext, Plaintiff has failed to provide any evidence actually contradicting Defendants' stated reasons for termination. Thus, there is no issue of fact as to whether but for [Defendants'] alleged retaliatory motive, Plaintiff's employment would not have been terminated." *Trant*, 2012 WL 6690358, at *6.

Trant argues that the district court improperly shifted the burden of proof by requiring him to prove pretext at the summary judgment stage. He also argues that the record demonstrates that there are factual disputes as to the sexual harassment and insubordination allegations. We are not persuaded.

Summary judgment is appropriate on the fifth step when "any reasonable jury would [have found] that [the plaintiff] would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 117 (2d Cir. 2011); *see also Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1244–45 (10th Cir. 2009) (affirming summary judgment in part

-14-

because defendants met their burden at the fifth step); *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 59–60 (1st Cir. 2003) (granting defendants judgment as a matter of law based on *Mt. Healthy* analysis); *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998); *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1086 (11th Cir. 1996). Thus, for example, in *Anemone*, the court found that the "undisputed evidence" of the plaintiff's insubordination and the employer's "ongoing efforts to address it—efforts beginning well before any allegedly protected conduct—" were sufficient to meet the defendants' burden at the summary judgment stage. 629 F.3d at 117. And it was significant that the plaintiff was aware that his job was in jeopardy before he engaged in the protected conduct. *See id.* at 118. *Anemone* is instructive in its discussion on the proper way to conduct a *Mt. Healthy* analysis:

> [A]lthough the language in *Mt. Healthy* refers to the plaintiff's [protected] conduct, the Court's analysis, properly understood, attempts to weigh the impact of the defendant's impermissible reason on the defendant's decision to act. . . . The relevant question then, with respect to Anemone's speech to the [*New York*] *Times*, is not whether he would have suffered termination absent the speech itself, but rather whether even without the improper motivation the alleged retaliatory action would have occurred.

*Id.* at 120.

Similarly, in *Couch*, we held that a public hospital had met its burden at the fifth step because it would have taken the same actions against the plaintiff, a staff physician at the hospital, even absent the plaintiff's protected speech. 587

F.3d at 1244–45. The plaintiff had accused other physicians at the hospital of using alcohol and illegal drugs and forcefully advocated for changes in drug and alcohol testing policy. Although the district court had granted summary judgment for the defendants at the fourth step, we held that alternate grounds existed at the fifth step of the *Garcetti*/*Pickering* test. *Id.* We concluded the alleged retaliatory conduct—hospital investigations of allegations against the plaintiff concerning disruptive conduct, billing fraud, and patient mistreatment and subsequent corrective actions—was "entirely appropriate" considering the serious allegations against the plaintiff and the recommendations of the investigations. *Id.* at 1245.

The district court did not improperly shift the burden of proof to Trant at the fifth step. In deciding that the Board would have fired Trant regardless of his statements about hiring counsel, the district court concluded that the Board had met its evidentiary burden at the fifth step. Trant's bare assertion of pretext is simply another way of arguing that the Board did not meet its burden of proof that it would have fired Trant even absent his protected speech. But the reasons the Board offered were sufficient to show that any retaliatory motive was not the but-for cause of Trant's termination.

Considering the recent sexual harassment scandals at the OCME, Trant's admitted statements to and about Ballard provided the Board more than a sufficient reason to terminate his at-will employment. Trant's rebuttal evidence, that his actions did not constitute sexual harassment under the law, does not call

into question the soundness of the Board's decision. The Board was justified in firing Trant for his misconduct even if it did not result in an actionable sexual harassment claim, especially as he was the head of an already scandal-plagued agency. The Board had interests in the smooth functioning of the agency and repairing the agency's public image. Even though there may not have been an actionable claim of sexual harassment, there was an interest in eliminating the appearance of impropriety. Because "the lawful reason alone would have sufficed to justify the firing," Trant cannot succeed on his claim. *McKennon*, 513 U.S. at 359; *see also Couch*, 587 F.3d at 1245 (holding that hospital would have taken same "entirely appropriate" actions concerning plaintiff's alleged misconduct even absent plaintiff's protected speech).

Trant asserts that his alleged insubordination was a pretext for his termination. He supports his argument in two ways. First, he argues the Board's directive to contact only certain people was open to interpretation. This, however, contradicts Trant's own deposition testimony, in which he stated he understood he was to contact only Dr. Duval or Chris Ferguson. *See* App. 2701. Second, Trant points to the testimony of the Board's Rule 30(b)(6) witness,[4] who explained that there was no public reason offered for Trant's termination. Trant argues that this testimony shows that the Board was unable to identify a basis for

---

[4] Rule 30(b)(6) of the Federal Rules of Civil Procedure permits an entity to designate an individual to testify on its behalf in a deposition.

termination and that his alleged insubordination was "an excuse seized upon to attempt to avoid liability for the First Amendment violation." Aplt. Br. at 48. But the Rule 30(b)(6) witness's testimony—that there was no *public* reason given for Trant's termination—is not inconsistent with Board members' testimony that Trant was insubordinate. And the handwritten notes from the February 5 meeting, which indicate that the Board members fired Trant for violating the terms of his administrative leave, undermine Trant's claim that the insubordination was a *post hoc* excuse for a retaliatory termination. We see no dispute of material fact.

Finally, it is undisputed Trant's conflict with the Board over the management of the OCME predated any of Trant's protected speech. Trant recognized that his job was in jeopardy because of this conflict before any Board meeting was called, as his January 28 email to Andrews makes clear. The handwritten notes from the February 5 Board meeting list a dozen reasons for terminating Trant. The Board members articulated several legitimate bases for termination—in addition to those cited by the district court—including Trant's questionable judgment in holding onto the emails related to the grand jury investigation for two months before revealing them, erratic behavior, conflicts with legislators in the media, failure to follow the reorganization plan, and ineffectiveness as Chief Medical Examiner. The impact of any impermissible motive on the Board's decision to act was minimal in light of Trant's inappropriate comments, insubordination, and other serious reasons for

termination.  *See Anemone*, 629 F.3d at 120.

Because the Board has introduced sufficient undisputed evidence to establish that it would have terminated Trant absent any alleged retaliatory motive, the district court was correct in granting summary judgment for the Board.

### 2. Retaliation Claims Against Ballard, Jordan, and Balzer

Trant next argues that Cherokee Ballard, Tom Jordan, and Sandra Balzer took retaliatory actions against him as a result of his protected speech.  These claims require a different analysis since the *Garcetti*/*Pickering* test is not appropriate for a First Amendment retaliation claim against a defendant who is not the plaintiff's employer.  *See Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).  Instead, under *Worrell*, claims against non-employers must satisfy three elements: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  *Id.* (internal quotation marks omitted).

At the summary judgment stage, some facts must demonstrate the defendants "acted on the basis of a culpable subjective state of mind" to satisfy the third step.  *See McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 905 (10th Cir.

-19-

2002) (internal quotation marks omitted). "If the defendant's intent in urging adverse action against the employee is not retaliatory (*e.g.*, if the defendant identifies legitimate problems with employee's qualifications or performance) or if the defendant's conduct did not cause the adverse action, then the defendant may successfully defend the retaliation claim." *Worrell*, 219 F.3d at 1213. And temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive. *See Butler v. City of Prairie Village*, 172 F.3d 736, 746 (10th Cir. 1999).

We previously concluded that Trant engaged in protected speech, so we proceed to the second and third elements.[5]

### a.  Cherokee Ballard

The district court correctly granted summary judgment for Ballard. Trant alleged that Ballard participated in the creation of a press release issued by state Representative Randy Terrill that accused Trant of stealing OCME property. The district court correctly determined that there was no record evidence of Ballard's participation. Trant notes that he was unable to provide specific evidence for his allegations because the district court did not rule on his motion to compel Terrill

---

[5]  Ballard and Jordan were Trant's subordinates. We have never held that true subordinate employees may be liable for First Amendment retaliation claims. The Fifth Circuit has expressly rejected the notion that true subordinates can be liable for an employer's retaliation—only final decisionmakers may be liable. *See, e.g.*, *Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004). Because Trant's claims do not satisfy the *Worrell* test, it is not necessary to decide whether true subordinates may be liable for retaliation claims.

to provide testimony by the time Trant had to respond to the summary judgment motion, but Trant does not allege the court erred in denying the motion.

Trant also alleged that Ballard participated in reporting to the media that Trant had stolen OCME property. But Trant mischaracterizes Ballard's statements. Ballard merely responded to inquiries at a press conference initiated by Trant's attorneys regarding missing OCME property. She explained that records indicated that Trant had checked out certain items and had not returned them. She never referred to the items as stolen. Further, there is no evidence that her statements were substantially motivated by Trant's protected speech.

### b. Tom Jordan

The district court also correctly granted summary judgment for Jordan. Trant alleged that Jordan twice advised the media that Trant was "inept or incompetent, was a liar and was mentally unstable." *Trant*, 2012 WL 6690358, at *8. Trant concedes that these feelings predated any protected speech, but alleges that Jordan's decision to go to the media was retaliatory.[6]

Trant has pointed to no evidence, besides temporal proximity, that Jordan's comments were substantially motivated by Trant's protected speech or that Jordan made his comments with a retaliatory intent. Jordan's comments are plainly

---

[6] There is a fact dispute as to whether Jordan made the alleged statements to the media at all. Jordan asserts that any media quotes attributable to him actually came from an email that Trant circulated to a Board member. For purposes of summary judgment, we will resolve this factual dispute in favor of the non-moving party and assume Jordan went to the media.

-21-

directed at the ongoing dispute about Trant's management of the OCME that preceded any protected speech. They bear no relation to Trant's protected speech, which concerns hiring an attorney and reporting grand jury improprieties to authorities. Indeed, Trant's statements do not implicate Jordan because they concerned only the Board, of which Jordan was not a member. This fact "implies that [Jordan did not have] any motivation for retaliating against" Trant. *Butler*, 172 F.3d at 746.

### c. Sandra Balzer

Finally, we also see no error in the district court's grant of summary judgment for Balzer. Balzer, a lawyer in the Oklahoma Attorney General's office, was responsible for providing legal advice to the Board. Trant alleged that she participated in his termination by condoning the unlawful retaliation against him. Specifically, he argued that she condoned his termination by remaining silent when the Board considered firing Trant on February 5 in part because of his protected speech.

Trant has not introduced any evidence that Balzer's alleged condoning of the action was substantially motivated by the protected speech. She advised the Board on the legal definition of sexual harassment and advised them that they possessed the authority to fire an at-will employee. There is no evidence that she recommended Trant's suspension or termination. Further, Trant provides no evidence that Balzer deliberately avoided advising the Board about the

-22-

unlawfulness of terminating an employee for his protected speech—nor is it clear that the situation called for such advice.

*　　*　　*

The district court was correct in granting summary judgment for Ballard, Jordan, and Balzer.

### B.  *Oklahoma Open Meetings Act Claim*

Trant next contends that the Board violated the Oklahoma Open Meetings Act (OMA), 25 Okla. Stat. § 301 *et seq.*, based on (1) its failure to give proper notice of the meetings in which Trant's employment was discussed; (2) his exclusion from executive session meetings; and (3) its failure to open the February 5 meeting to the public.  He sought a declaratory judgment that his termination was invalid because of the Board's failure to comply with the OMA.

The district court dismissed the claim for lack of standing.  The court explained that the only relief the court could grant to Trant was a declaratory judgment that the termination was void as well as reinstatement to his position.  Reinstatement, however, was no longer possible because the position of Chief Medical Examiner had long been filled.  *See, e.g.*, *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) ("[F]ederal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.") (internal quotation marks omitted).  In this posture, Trant's claim lacked redressability, an essential element of Article III

-23-

standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The

district court consequently dismissed Trant's claim for lack of standing.

Trant, however, argued below that *other* forms of relief were available to

the district court.  For instance, he contends he was entitled to back pay for the

period of his unlawful removal, a claim the district court rejected on sovereign

immunity grounds.  According to the district court, the defendants expressly

reserved their sovereign immunity rights as to any future claims for monetary

damages.  The district court held that Trant "cannot now try to backdoor a

damages award and thwart the State's reserved sovereign immunity by asking for

relief not initially sought in his Amended Petition of May 6, 2010."  *Trant*, 2012

WL 6690358, at *4.  The court held that it thus lacked jurisdiction over the

monetary relief claim.

We disagree on this point.  The general presumption is that "removal is a

form of voluntary invocation of a federal court's jurisdiction sufficient to waive

the State's otherwise valid objection to litigation of a matter (here of state law) in

a federal forum."  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613,

624 (2002).  In *Lapides*, the Supreme Court addressed state law claims to which

the state had waived immunity in its own courts.  Although the Court did not

clarify the extent to which the removal of state law claims results in forfeiture of

sovereign immunity, the presumption is that voluntary removal constitutes

consent to have the claim heard in a federal forum.  *Id.* at 620; *see also Meyers ex*

*rel. Benzing v. Texas*, 410 F.3d 236, 252 (5th Cir. 2005) ("[A] state's removal of a case into federal court, without more, clearly demonstrates the state's consent to invoke and submit to federal jurisdiction so that the general legal principle of voluntary invocation requiring waiver of immunity ought to apply."); *Skelton v. Henry*, 390 F.3d 614, 618 (8th Cir. 2004) ("We focus on whether the state's action in litigation clearly invokes the jurisdiction of the federal court, not on the intention of the state to waive immunity.").

But *Lapides* tells only half the story. A state enjoys another kind of sovereign immunity besides immunity from suit that it may invoke even after agreeing to removal—immunity from liability. Because immunity is an inherent aspect of sovereignty that the states retained upon entering the Union, *Alden v. Maine*, 527 U.S. 706, 713 (1999), it follows that state law should determine the nature and scope of a state's immunity. As the Fifth Circuit explained in *Meyers*,

> Rather than require that the states adhere to a prescribed plan, the [Supreme] Court's decisions envision a Constitution that affords the states discretion to waive or vary the nature and elements of their sovereign immunity. Consequently, courts must look to the law of the particular state in determining whether it has established a separate immunity against liability for purposes of waiver. Unlike a state's waiver of its immunity from suit in federal court, the state's waiver or retention of a separate immunity from liability is not a matter in which there is an overriding federal interest justifying the application of a federal rule. For these reasons, we conclude that the Constitution permits a state whose law provides that it possesses an immunity from liability separate from its immunity from suit to

> show that its waiver of one does not affect its enjoyment of the other.

*Meyers*, 410 F.3d at 253 (footnotes and citations omitted); *see also Sossamon v. Texas*, 131 S. Ct. 1651, 1658, 179 L. Ed. 2d 700 (2011) ("[A] waiver of sovereign immunity to other types of relief does not waive immunity to damages . . . ."); *Stroud v. McIntosh*, 722 F.3d 1294, 1302 (11th Cir. 2013) ("[U]nder *Lapides*'s reasoning, a state waives its immunity from a federal forum when it removes a case, which voluntarily invokes the jurisdiction of that federal forum. But nothing in *Lapides* suggests that a state waives any defense it would have enjoyed in state court—including immunity from liability for particular claims."), *cert. denied*, 134 S. Ct. 958 (2014); *Lombardo v. Penn., Dep't of Pub. Welfare*, 540 F.3d 190, 195 (3d Cir. 2008) ("State sovereign immunity thus comprises more than just immunity from suit in federal court. It also includes a State's immunity from liability.").

Recognizing that a state may waive immunity from suit while retaining immunity from liability for monetary damages is consistent with our holding in *Estes v. Wyoming Department of Transportation*, 302 F.3d 1200 (10th Cir. 2002). In *Estes*, we concluded that Wyoming's removal of a federal law claim acted as an unequivocal waiver of immunity from suit in federal court. *Id.* at 1205–06. But our holding was based on the principle, articulated in *Lapides*, that the Constitution cannot permit states to take inconsistent litigating positions by

invoking and challenging federal court jurisdiction. *See id.* at 1206 ("It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand.") (quoting *Lapides*, 535 U.S. at 619); *see also Stroud*, 722 F.3d at 1302 ("[I]t would be unfair to allow a state to remove to a federal forum and then assert a jurisdictional immunity from that federal forum—this tactic would allow a state to essentially use removal as a jurisdictional trump card in any case initiated in a state forum that could fall under the original jurisdiction of the federal courts.").

Unlike effecting a waiver of immunity from suit through removal, however, "the state's waiver or retention of a separate immunity from liability is not a matter in which there is an overriding federal interest justifying the application of a federal rule." *Meyers*, 410 F.3d at 253. A state does not gain an unfair advantage asserting in federal court an affirmative defense it would have had in state court. Accordingly, we recognize that a state may waive its immunity from suit in a federal forum while retaining its immunity from liability.

Oklahoma, by consenting to removal, waived its immunity from suit. In his amended complaint in state court, Trant sought "reinstatement . . . with the emoluments of his position including back pay." App. 110. After Trant filed his amended complaint, Ballard removed to federal court and the state filed a "Notice

of Non-Objection of Removal."[7]  In this notice, the state consented to removal and expressly reserved its sovereign immunity as to *future* claims, not *all* claims. When Trant subsequently brought further state law claims and requests for monetary relief in federal court, the state effectively invoked its reservation of sovereign immunity.  By consenting to removal, Oklahoma waived its immunity from suit as to existing claims, including Trant's claim for back pay.

Nevertheless, the district court may have been correct to dismiss the claim on standing grounds if Oklahoma did not waive its immunity from liability for money damages.  But if Oklahoma did waive its immunity from liability, which must be assessed according to state law, Trant has standing to pursue his claim in federal court.[8]  We remand this claim to the district court.  Considering the resolution of all Trant's federal claims, the district court must also reassess whether maintaining supplemental jurisdiction is appropriate.[9]

---

[7]  It is immaterial that the state did not initiate the removal proceedings because all parties are required to agree to removal before a case can be removed. 28 U.S.C. § 1446(b)(2)(A).

[8]  The district court was correct in holding that the only redressable injury Trant suffered was his termination at the February 5 meeting. *Trant*, 2012 WL 6690358, at *3.  Thus, he may have standing only on OMA claims arising from the Board's handling of the February 5 meeting.

[9]  There are two related matters that must be addressed.  First, although Trant incorrectly stated "mandamus" as a separate cause of action in his amended complaint, the district court is not correct that mandamus relief is unavailable.  If Trant's OMA claim is ultimately successful, a writ of mandamus is a potential form of relief.  Second, it appears Oklahoma's Whistleblower Act does not

(continued...)

### C. Breach of Implied Contract Claim

Finally, Trant contends the district court erred in dismissing his breach of implied contract claim. Trant argues that the OMA established an implied contract between him and the state for certain procedural rights while the Board considered terminating him.

Trant relies on several Oklahoma cases. The first, from the Oklahoma Court of Civil Appeals, holds that "personnel policies extending benefits [are] unilateral offers which are accepted by continued performance." *Langdon v. Saga Corp.*, 569 P.2d 524, 528 (Okla. Civ. App. 1976). Trant also points to two cases in which the court held that the existence of an employee handbook created enforceable procedural rights for an at-will employee. *See Parker v. Town of Chelsea*, 263 F. App'x 740 (10th Cir. 2008); *Kester v. City of Stilwell*, 933 P.2d 952, 953 (Okla. Civ. App. 1997). He argues "the existing applicable law is part of every contract as if it were expressly referred to or incorporated within the agreement." Aplt. Br. at 27 (quoting *East Cent. Oklahoma Electric Coop., Inc. v. Public Service Co.*, 469 P.2d 662 (Okla. 1970)). He also argues that statutory procedural protections for state employees who were terminated may provide a cause of action for breach of implied contract. *See, e.g.*, *In re City of Durant*,

_____

[9](...continued) require Trant to exhaust his administrative remedies before seeking equitable relief for his OMA claim. The Whistleblower Act does not require exhaustion for claims for relief based on an alleged willful violation of the OMA. *See* 74 Okla. Stat. § 840-2.5(b), (c), (g); 74 Okla. Stat. § 840-2.6.

2002 OK 52, 50 P.3d 218 (Okla. 2002).

We disagree. *Durant* did not hold that public employees' procedural rights provided the basis for a breach of contract claim. Rather, the court simply enforced the express statutory rights granted to a specific class of employees by virtue of their membership status in a pension system. The OMA, in contrast, does not guarantee an employee any procedural rights by virtue of his employment. The OMA was enacted for the public's benefit and not to provide a private right of action in employment matters. *See* 25 Okla. Stat. § 302 ("It is the public policy of the State of Oklahoma to encourage and facilitate an informed citizenry's understanding of the governmental processes and governmental problems."); *see also Rabin v. Bartlesville Redevelopment Trust Auth.*, 2013 OK CIV APP 72 ¶ 9, 308 P.3d 191, 193 (Okla. Civ. App. 2013) ("The legislature enacted the O[klahoma] OMA for the public's benefit, and it is to be construed liberally in favor of the public.") (internal quotation marks omitted). Trant points to no case supporting his contention that a state agency's employees derive private contractual procedural rights from the OMA.

Employees of agencies subject to the OMA may incidentally benefit from procedures that govern meetings and may be able to challenge failures to comply with the OMA. The OMA contains a provision allowing for suits to overturn decisions made during meetings that violated the statute's procedural requirements. *See* 25 Okla. Stat. § 313. Indeed, Trant may continue to challenge

-30-

his termination for the Board's alleged lack of compliance with the OMA and seek appropriate relief through his unresolved declaratory judgment action. *See Graybill v. Okla. State Bd. of Educ.*, 585 P.2d 1358, 1359–60 (Okla. 1978); *Oldham v. Drummond Bd. of Educ.*, 542 P.2d 1309, 1310–11 (Okla. 1975). But he cannot seek reinstatement or damages on a breach of implied contract theory.

The OMA does not constitute a direct promise to any employee, nor is it a statutory scheme to provide individual relief to a particular class of employees. Trant therefore has no claim for a breach of implied contract based on alleged violations of the OMA.

## III. Conclusion

We AFFIRM the district court's grant of summary judgment for the defendants on Trant's First Amendment claims and AFFIRM the dismissal of Trant's breach of implied contract claim; we REVERSE the district court's dismissal of Trant's Oklahoma Open Meetings Act claim; and we REMAND for further proceedings consistent with this opinion.