**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 3, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MIKE DENTON,

    Plaintiff - Appellant,

v.

DAN YANCEY, individually and in his
official capacity; RODNEY RAY,
individually and in his official capacity;
CITY OF OWASSO, OKLAHOMA, a
municipal corporation,

    Defendants - Appellees.

No. 15-5114
(D.C. No. 4:13-CV-00709-TCK-TLW)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **PHILLIPS**, Circuit Judges.
_____

Mike Denton, a lieutenant with the Owasso Police Department, sued

defendants under 42 U.S.C. §§ 1983 and 1981 for the alleged violation of his First

Amendment rights to free speech and association. The district court granted

summary judgment in favor of defendants. Denton now appeals. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

---

    [*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## BACKGROUND

Denton was part of a group of officers involved in the arrest of a domestic abuse suspect on June 30, 2011. The suspect was transported to the police station where three officers—Denton, a sergeant, and patrol officer—got the suspect into the station for booking and eventually to a cell. Three incidents involving Denton's alleged use of excessive force were captured on video.

First was the "ramp" incident. After arriving at the station, the suspect, whose hands were cuffed behind his back, went limp at the base of some steps leading to the building, which in turn caused the patrol officer and Denton to stumble over the suspect as they came up the stairs. When the suspect refused to get up and walk, Denton stepped on his head before the officers picked him up and carried him inside.

Second was the "lobby" incident. When the three officers got the suspect inside, they placed him on the floor, face down. Denton then lifted the suspect's arms up and over the back of his head in a maneuver that drove the suspect's face into the floor.

Third was the "sally-port" incident, which was captured on a body camera.[1] The sally-port is a secure area between the booking area and cells. The three officers had passed through the first door and were waiting for the second door to open. When the door opened, Denton turned around and smashed the suspect in the face three times with his arm.

---

[1] Although Denton turned off his body camera, the other two officers kept theirs turned on.

Later in the shift, the patrol officer reported his concern about Denton's blows to the suspect's face to his supervisor—the sergeant who was part of the arrest. The sergeant in turn passed this concern on to his supervisor—Denton. Denton explained that he delivered the blows as a deterrent to the suspect who was getting ready to spit on him. Meanwhile, on July 7, 2011, Denton sent an email to his fellow union members encouraging them to reject two changes to a proposed new collective bargaining agreement.

Apparently nothing was done informally to satisfy the patrol officer's concern because on July 26, 2011, he filed a formal complaint concerning Denton's conduct. Owasso Police Chief Dan Yancey reviewed the video evidence and retained an independent investigator to review the matter. The investigator concluded that some or all of the force used by Denton could be considered excessive. Relying on the investigator's report, Chief Yancey issued a proposed disciplinary action notice in October 2011, in which he recommended that Denton be fired. Following a hearing, an impartial hearing officer agreed with Chief Yancey's recommendation. Ultimately, the decision to dismiss Denton was approved in November 2011 by Rodney Ray, the city manager.

Exercising his right to challenge the decision, Denton and his union filed for arbitration. Following a hearing, the arbitrator issued a decision in June 2012, in which he held that Denton did not use excessive force and the decision to fire Denton should be reversed in favor of a written reprimand. Denton, through his attorney, provided a copy of the arbitration award to the local news media. And not long

3

thereafter, Denton's attorney gave an interview to the *Tulsa World*, in which he described the events on June 30, 2011, including the contents of the video footage that was at the heart of the dispute. Prior to the attorney's disclosures, defendants had opposed the *Tulsa World*'s open-records request for the video on the grounds that it had the potential to invade Denton's privacy, was the subject of arbitration proceedings, and defendants were in litigation with the suspect. But these concerns disappeared when Denton's attorney, for all intents and purposes, revealed what was on the video. Because Denton himself had effectively disclosed the contents of the video, defendants decided to end the open-records litigation and released the video footage to the *Tulsa World*. And by this time, defendants had obtained a release from the suspect.

Defendants appealed the arbitration award to state court, which entered an order vacating the arbitrator's decision. While Denton's appeal was pending in the state appellate court, he filed suit in federal court. The district court stayed the suit pending the outcome of Denton's appeal. Denton prevailed and he was reinstated with back pay and benefits. The court lifted the stay.

As to the speech related claim, Denton argued that defendants' decision to release the video was in retaliation for his speech at the arbitration. Alternatively he argued that the decision to initiate the investigation, terminate his employment, and/or release the video footage was in retaliation for Denton sending the July 7, 2011 email to his fellow union members. The district court concluded that neither

4

claim survived scrutiny under the *Garcetti/Pickering* test because Denton could not

establish one or more of the required elements.[2]

## STANDARD OF REVIEW

"We review *de novo* a grant of summary judgment, applying the same standard

that governs the district court. We view the evidence in the light most favorable to

the appellant." *Cypert v. Indep. Sch. Dist. No. I-050*, 661 F.3d 477, 480 (10th Cir.

2011) (citation and internal quotation marks omitted). Summary judgment is

appropriate when "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"For dispositive issues on which the plaintiff will bear the burden of proof at

trial, he must go beyond the pleadings and designate specific facts so as to make a

showing sufficient to establish the existence of an element essential to his case in

order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197

(10th Cir. 2007) (brackets and internal quotation marks omitted). The evidence

"must be based on more than mere speculation, conjecture, or surmise." *Id*. (internal

quotation marks omitted). In other words, "[u]nsubstantiated allegations carry no

probative weight in summary judgment proceedings." *Id*. (internal quotation marks

omitted).

Denton argues that the district court impermissibly "assumed a fact finding

role and made determinations of credibility and weighed all inferences on the

---

[2] Denton conceded his Fourteenth Amendment due process claim.

evidence in favor of [defendants]." Aplt. Opening Br. at 10.  To the contrary, the

court concluded that there was no evidence on one or more elements of the claims.

**ANALYSIS**

**Speech Claim**

According to Denton, defendants decided to release the video to the *Tulsa*

*World* in retaliation for the testimony he gave at the arbitration hearing.  In reviewing

a public employee's First Amendment retaliation claim, we apply the test established

in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Board of Education*,

391 U.S. 563 (1968).  *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014).  The

test has five elements:

> (1) [W]hether the speech was made pursuant to an employee's official
> duties; (2) whether the speech was on a matter of public concern;
> (3) whether the government's interests, as employer, in promoting the
> efficiency of the public service are sufficient to outweigh the plaintiff's
> free speech interests; (4) whether the protected speech was a motivating
> factor in the adverse employment action; and (5) whether the defendant
> would have reached the same employment decision in the absence of the
> protected conduct.

*Id.* (internal quotation marks omitted).  "The first three elements are issues of law for the

court to decide, while the last two are factual issues typically decided by the jury."  *Id.*

The parties agree that Denton's testimony at the arbitration hearing was not

part of his official duties and was therefore protected speech.  *See Garcetti*, 547 U.S.

at 421 (holding that "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment

6

purposes, and the Constitution does not insulate their communications from employer discipline").

"At the second step, we determine whether the speech is a matter of public concern." *Trant*, 754 F.3d at 1165. We agree with defendants that Denton's speech—his arbitration testimony—was not a matter of public concern. "Speech is a matter of public concern if it is of interest to the community." *Id*. (internal quotation marks omitted). In making this determination, "we focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Id*. (internal quotation marks omitted). "Speech involves a public concern when the speaker intends to bring to light actual or potential wrongdoing or breach of public trust by a public official or to disclose any evidence of corruption, impropriety, or other malfeasance within a governmental entity." *Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1228 (10th Cir. 2014) (brackets and internal quotation marks omitted). Denton's motive was to regain his job—not to expose some wrongdoing or malfeasance.

Because Denton's arbitration testimony did not concern a matter of public interest, summary judgment in favor of defendants was appropriate. *See Garcetti*, 547 U.S. at 418 (holding if an employee does not speak as a citizen on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech").

7

**Association Claim**

The gravamen of this claim is Denton's argument that defendants decided to investigate the June 30, 2011, arrest, terminate his employment, and release the video to the *Tulsa World* in retaliation for the July 7, 2011, email he sent to his fellow union members. Denton also argues that because Owasso declined to impose any significant discipline against a group of police officers who engaged in similar conduct during the arrest of a suspect several years earlier, the harsher decisions made with regard to Denton must have been linked to his union activity when he sent the email.

Although the *Garcetti/Pickering* analysis applies to an association based retaliation claim, a plaintiff need only satisfy the first, fourth, and fifth prongs of the test. *See Shrum v. City of Coweta*, 449 F.3d 1132, 1138-39 (10th Cir. 2006) (holding that a court should not require a showing of "public concern" or engage in judicial balancing of the employer's interest against the employee's interest when the public employee alleges retaliation for participation in a union with which his employer has signed a collective bargaining agreement). Accordingly, we examine whether the email was sent pursuant to Denton's official duties, whether the content of the email was a motivating factor in the adverse employment action, and whether defendants would have reached the same employment decision in the absence of the email.

The district court ultimately concluded that Denton failed to present any evidence on the fourth element of the *Garcetti/Pickering* analysis—whether the email was a motivating factor in the decision made to investigate the June 30, 2011, incident,

8

Chief Yancey's recommendation that Denton be fired, and City Manager Ray's decision to terminate his employment.

At several places in his opening brief, Denton says that Chief Yancey knew about the email and its contents even before he launched the investigation. The problem for Denton is that there is no such evidence. Instead, Chief Yancey testified at his deposition that although he "most likely probably did [see the email]," there is no evidence as to when he saw it. Aplt. App. at 147.[3]

Moreover, there is no evidence that Denton was treated more harshly than the officers who were involved in the excessive force incident several years earlier because he was a union member. As the district court explained, there was no evidence that the officers involved in the earlier incident were not union members. Denton's unsubstantiated allegations are insufficient to defeat summary judgment.

The judgment of the district court is affirmed.

Entered for the Court


Timothy M. Tymkovich
Chief Judge

---

[3] There is no evidence that City Manager Ray was ever aware of the July 7, 2011, email.