**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MAX SEIFERT,

      Plaintiff - Appellant,

v.

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY/KANSAS
CITY, KANSAS; SHERIFF DONALD
ASH; UNDERSHERIFF LARRY
ROLAND,

      Defendants - Appellees.

No. 13-3153

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:11-CV-02327-JTM-JPO)**

---

Cheryl A. Pilate, Morgan Pilate LLC, Kansas City, Missouri, for Plaintiff – Appellant.

Carl A. Gallagher (Teresa A. Mata with him on the brief), of McAnany, Van Cleave & Phillips, P.A., Kansas City, Kansas, for Defendants – Appellees.

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

Plaintiff Max Seifert brings civil-rights claims under 42 U.S.C. §§ 1983 and 1985 and state-law retaliation claims against Defendants Unified Government of Wyandotte County and Kansas City, Kansas (the Unified Government), Wyandotte County Sheriff Donald Ash, and Wyandotte County Undersheriff Larry Roland. Plaintiff, a former reserve deputy for the Wyandotte County Sheriff's Department (WCSD), alleges that Defendants removed him from investigations and revoked his reserve commission because of his testimony supporting allegations by a former criminal defendant of mistreatment by federal law-enforcement officers. The district court granted Defendants summary judgment, holding that Plaintiff's testimony was not legally protected speech, that Defendants' actions were not unconstitutionally motivated, and that Defendants would have taken the same actions regardless of his testimony. *See Seifert v. Unified Gov't of Wyandotte Cnty./Kan. City Kan.*, No. 11-2327-JTM, 2013 WL 2631632, at *11–12 (D. Kan. June 12, 2013) (unpublished).

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand. We affirm the dismissal of Plaintiff's state-law claims because federal law provides an adequate alternative remedy; and we affirm the qualified-immunity dismissal of the § 1983 claims against Sheriff Ash and Undersheriff Roland because at the time of the alleged retaliatory actions the law was not clearly established that the First Amendment protected Plaintiff's testimony. In all other respects we reverse and remand, holding that Plaintiff's testimony was constitutionally protected and a jury could reasonably find that the explanations Defendants gave for their actions were pretextual.

2

## I.     BACKGROUND

### A.     The Facts

On July 10, 2003, Barron Bowling was involved in a minor car accident with Agent Timothy McCue of the federal Drug Enforcement Administration (DEA). Bowling later sued McCue and other individuals and entities in federal district court for injuries that arose out of this incident, and our recitation of facts regarding the incident relies on the court's findings of fact in the bench trial of that suit (the *Bowling* findings). *See Bowling v. United States*, 740 F. Supp. 2d 1240 (D. Kan. 2010). For the remaining facts, we recite the evidence in the light most favorable to Plaintiff. *See Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 731 (10th Cir. 2014) ("On review of summary judgment, we recite the facts in the light most favorable to . . . the nonmovant.").

Bowling was driving his personal automobile near his house when Agent McCue in an unmarked vehicle attempted to pass him illegally on the right. Bowling accelerated, both because the street began to go uphill and to prevent McCue from passing him. McCue sped up as well to try to get around Bowling. A sideswipe collision resulted, which was McCue's fault. The vehicles did not stop after the collision. McCue radioed another agent who joined McCue in following Bowling. Bowling stopped after McCue activated his siren. McCue and the other agent rushed Bowling's car and pulled him from it. Bowling was forced face-down on the hot pavement while shirtless; and he was pummeled, kicked, insulted, and arrested. Plaintiff, then a detective with the Kansas

3

City, Kansas Police Department (KCKPD), investigated the incident and documented the agents' misconduct, despite pressure from others in the KCKPD to cover up the facts.

Bowling was prosecuted on a felony and a misdemeanor charge arising out of the incident. At the trial in 2005, Plaintiff, who was subpoenaed as a defense witness, testified about Bowling's injuries. Bowling was acquitted of the felony charge and convicted of the misdemeanor (possession of a marijuana pipe). According to the *Bowling* findings, "[F]or crossing the 'thin blue line,'" *Bowling*, 740 F. Supp. 2d at 1262 n.75, Plaintiff "was shunned, subjected to gossip and defamation by his police colleagues, and treated as a pariah," *id.* at 1262. "He was castigated by his superiors, by the prosecutor, by the DEA, and upon his forced retirement [on December 21, 2005,] . . . denied a commission that would allow him to obtain work as a security guard, something police retirees typically rely upon to supplement their limited retirement income." *Id.* at 1262 n.75.

Plaintiff moved on, obtaining a reserve commission from the WCSD soon after his retirement. In exchange for his commission he was required, like other reserve deputies, to volunteer 16 hours per month with the WCSD. From January 2006 until June 2009, Plaintiff assisted the WCSD with criminal investigations to meet his reserve hours. He was also hired by the WCSD in June 2008 as a civilian employee in the jail classification unit, where he continues to work today. Meanwhile, as already mentioned, Bowling sued the DEA agents involved in his arrest, as well as the United States, the Unified

4

Government, and various members of the KCKPD. As that case moved toward trial in 2009 and ultimately was tried in 2010, the events giving rise to this appeal occurred.

On April 7, 2009, Defendant Donald Ash was elected Wyandotte County Sheriff. He appointed Defendant Larry Roland as Undersheriff. Sheriff Ash had previously served in the KCKPD for 34 years, where he became close friends with the two KCKPD police chiefs in charge during the Bowling affair, both of whom, according to Plaintiff, were hostile toward his involvement in that affair. On June 5, 2009, the Unified Government and KCKPD defendants agreed to settle the claims against them in the *Bowling* civil case, but the claim against the United States was tried in April and May 2010, and Plaintiff was a witness. Additional relevant events are recounted differently by the parties and other witnesses.

### 1. Plaintiff's Removal from Investigations

#### a. Plaintiff's Account

According to Plaintiff's declaration in this case and his testimony at the *Bowling* civil trial, on June 11, 2009 (six days after the agreement to settle with the Unified Government and the KCKPD), he was summoned to meet with Undersheriff Roland in his office. Roland told him that he would no longer be permitted to serve on investigations. Roland explained that he and Sheriff Ash had met with Wyandotte County District Attorney (DA) Jerome Gorman, who told them that his office would not accept cases involving Plaintiff because of concerns about his credibility. Roland also told Plaintiff that he would be unable to testify in federal court and that a federal

prosecutor, Assistant U.S. Attorney (AUSA) Terra Morehead, did not find him credible. These credibility concerns were ostensibly based on the judge's comments in a 1998 order in *United States v. Elam*, No. 98-20037-01 (D. Kan. Sept. 15, 1998). The order suppressed evidence obtained under a search warrant for drug evidence because Plaintiff had seized a large number of allegedly stolen items not covered by the warrant. The judge stated that she did not believe Plaintiff's account of his conversation with the defendant concerning those items. Plaintiff asked Roland why the federal ruling would also prevent his testimony in state court, given that he had testified in state court many times since 1998 and Gorman himself had obtained search warrants for him. Roland responded that Gorman had just become aware that the ruling prevented Plaintiff's testimony in state court and that he (Roland) was going to receive a copy of the ruling from a federal prosecutor. Plaintiff thought Roland's decision puzzling because, only a week before, his superiors had accepted a high-level case from him that resulted in criminal charges.

Roland went on to state that he had been told by unnamed others that Plaintiff could not serve as a reserve deputy, a law-enforcement position, while working simultaneously as a classification technician in the jail, a civilian position. Even so, Roland said that Plaintiff could keep his commission and another reserve assignment would be found for him.

After the meeting Plaintiff encountered Sheriff Ash. Plaintiff said to Ash that Ash had never had problems with him before. Ash agreed, stating that he had never had

problems with Plaintiff before and did not have any now. Plaintiff then met with Captain James Eickhoff to inquire regarding Roland's statements that Plaintiff could not work as both a reserve deputy and a civilian employee. Eickhoff told Plaintiff that there was no such rule, that several others worked as reserve deputies while holding other jobs, and that he would come to Plaintiff's defense if the issue came up again.

Less than a week later, Plaintiff saw DA Gorman at the courthouse. Plaintiff asked Gorman if he had told Ash and Roland that he would no longer accept cases involving him. Gorman became uncomfortable and stated that it was not his office that had problems with Plaintiff but prosecutors from other jurisdictions. Plaintiff took this as a reference to AUSA Morehead.

### b.      Undersheriff Roland's Account

Roland's account is largely consistent with Plaintiff's, although with less emphasis on Gorman's concerns. Roland recalled that sometime in the first half of 2009 he spoke with Chief Deputy Rickey Whitby, who told him that AUSA Morehead had some kind of problem with Plaintiff's credibility. Roland called Morehead, who confirmed that she had a problem with Plaintiff because of the *Elam* order. Morehead then sent Roland the order. Because Roland misplaced it, Morehead emailed him a second copy several months later, on June 29, 2009. It was prefaced with the following message:

> Here is the order from the federal case. They have the hearing
> transcript on order and I'll forward that to you when we get it. I never
> knew about this ruling until I came over in 2002, but since I've been here,
> and before Max retired from KCKPD, we had several issues with him
> bungling investigations that he knew were going to be federal cases.

7

*Id.*, Vol. V at 1188.

Before Plaintiff was removed from investigations, Roland had a conversation with Gorman, who said that Plaintiff had a problem with Morehead and that he had a concern that there might be a credibility issue if his office received cases from Plaintiff. (Roland said that Ash met with Gorman regarding Plaintiff but could not recall if he himself attended.)

The WCSD's executive staff, including Roland and Ash, decided that Plaintiff should be removed from investigations, particularly because Morehead had said that federal prosecutors would not accept his cases. When Roland met with Plaintiff, he told him that he had a copy of the *Elam* decision and that a federal prosecutor, whom he may have named as Morehead, had concerns about his credibility issues in court and his having bungled a few cases. Roland informed Plaintiff that Ash had decided he should be removed from investigations.

### c. Chief Deputy Whitby's Account

The testimony of Chief Deputy Whitby corroborates Roland's account of their interaction. According to Whitby, shortly after the election in early 2009 he spoke with AUSA Morehead. She spontaneously brought up the subject of Plaintiff, asking if he was still "doing cases" for the WCSD. *Id.* at 1272. When told that he was, Morehead advised Whitby that federal prosecutors would decline any case from Plaintiff because he had a "*Giglio* problem" that would require disclosure to defendants of evidence of his lack of veracity. *Id.* (In *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court

held that prosecutors should have disclosed to the defense information that contradicted the principal witness's testimony that he had received no promise of immunity from prosecution if he testified against the defendant.) Whitby reported the *Giglio* issue to Sheriff Ash and Undersheriff Roland.

### d. Sheriff Ash's Account

Sheriff Ash's testimony tracks Roland's in most respects. He recalled that Roland had been informed by AUSA Morehead, DA Gorman, or both that there were concerns about Plaintiff's continuing to work as an investigator because of questions about his credibility in court. Morehead had forwarded information about Plaintiff to Roland that she viewed as *Giglio* material that would have to be disclosed to the defense if Plaintiff testified in a prosecution. Ash and Roland met with Gorman to discuss the issue. Gorman told them that they should not send his office any case files from Plaintiff because he also viewed Plaintiff as falling under the provisions of *Giglio*. Ash and Roland concluded that Plaintiff would no longer be able to work on cases. Thereafter, Roland or Sergeant David Thaxton met with Plaintiff and told him that he could no longer do investigative work but could retain his reserve-deputy position by performing volunteer work in the jail, which Plaintiff refused to do.

### e. AUSA Morehead's Account

AUSA Morehead's testimony indicated that she had not taken any initiative regarding Plaintiff. She said that Roland called her to ask if there was a federal court opinion involving Plaintiff. Morehead replied that there was; and on June 29, 2009 (three

weeks after Plaintiff was removed from investigations), she emailed the *Elam* order to him with the message about Plaintiff's "bungling" investigations. Aplt. App., Vol. V at 1188. Morehead did not recall speaking with anyone else at the WCSD before speaking with Roland and did not know why he had called her.

Morehead did say, however, that in 2009 she conducted a series of law-enforcement training sessions with the DA's office, including Gorman. The subject of the training was testifying in court. During these sessions she identified Plaintiff by name and used the *Elam* order to illustrate how an officer can develop a *Giglio* problem.

### f. District Attorney Gorman's Account

Gorman's testimony calls into question the timing of events in the accounts of Roland and Ash and suggests that he was not the cause of Plaintiff's removal from investigations. In May 2009 (a month before Plaintiff was removed), Gorman received a memorandum from one of his employees advising that *Giglio* obligations usually do not apply to police officers because they are not key witnesses at trial. After reviewing the memo at his deposition, Gorman stated his agreement with its conclusion that *Giglio* obligations apply only to key witnesses.

Gorman recalled conducting law-enforcement training sessions with Morehead on the subject of officer testimony. At the sessions Morehead spoke about how officers could develop a *Giglio* problem, and she used Plaintiff and the *Elam* order as an example. In early February 2010 (eight months after Plaintiff's removal from investigations) Gorman received a letter from Plaintiff's attorney demanding that he stop the attacks on

10

Plaintiff's reputation, including the circulation of the *Elam* order and the references to him as "*Giglioed*" at the training sessions. *Id.*, Vol. VI at 1317. At this point Gorman had no opinion about whether Plaintiff had a genuine *Giglio* problem, but he requested the *Elam* order from Morehead so he could review the issue for himself. On February 10, AUSA David Plinsky emailed Gorman the *Elam* order.

Sometime after receiving the order, Gorman was approached by representatives of the sheriff's office to discuss Plaintiff and the *Elam* order. Gorman told them that he had read the order and had concluded that it would need to be disclosed to defense counsel under *Giglio* if Plaintiff was used in a case, a fact that he would need to take into consideration when deciding whether to accept a case from Plaintiff.

### 2. Plaintiff's Commission Revoked

The trial of Bowling's claims against the United States (all other defendants had settled) began on March 1, 2010. Plaintiff testified for Bowling on March 4 and March 9. Meanwhile Plaintiff, having been removed from investigations, was without an assignment as a reserve deputy. Before the trial, in early 2010, the reserves supervisor, Sergeant Thaxton, had asked Undersheriff Roland if Plaintiff could conduct training for the reserve deputies since he had no other reserve position. Roland declined the request, citing Plaintiff's *Giglio* issue. On March 31, Thaxton followed up with an email to Roland notifying him that Plaintiff "would like to be involved with the program and would like to know when he can assist." *Id.* at 1467. He received no response.

11

On April 8 the *Bowling* trial concluded. Five days later Plaintiff received a memorandum signed by Roland and Thaxton, with Sheriff Ash copied, stating in its entirety:

> Your Service as a Reserved Deputy is no longer needed at this time. Your tenure as a Reserve for the Wyandotte County Sheriff's Office has been greatly appreciated. This is an Administrative action; please address all concerns or questions to the Undersheriff Larry Roland.
>
> Please return all agency issued items including your commission card to me the Reserve Unit Coordinator.

*Id.*, Vol. V at 1003. Thaxton testified that he had been advised by Roland that if Plaintiff questioned his decommissioning, Thaxton should cite "the Fair Standards Labor [sic] Act [FLSA] where you can't be employed by a company and then do free labor for them." *Id.* at 1013. When Thaxton asked Roland, "Where is that in there for my educational purposes," Roland referred him to a major, who initially referred him back to Roland, who then said to just tell Plaintiff it was an "administrative decision." *Id.* (internal quotation marks omitted).

According to Ash and Roland, Plaintiff lost his commission because he refused to work in the short-staffed jail, as required for all reserve deputies at the time. There is no dispute that Plaintiff refused to work in the jail. But there is a dispute about when he was told that he would have to. Plaintiff states that it was in July or August 2010, months after his commission had been revoked. Defendants' brief offers no date for the meeting, though Roland stated his belief that it occurred in 2009 and Ash testified that it occurred before Plaintiff received the April 2010 memorandum terminating his commission.

12

**B. Procedural History**

Plaintiff sued Defendants on June 9, 2011, in the United States District Court for the District of Kansas. All his claims—under 42 U.S.C. §§ 1983 and 1985 and under Kansas law—were predicated on the allegation that the actions against him were taken to deter him from testifying for Bowling or to punish him for doing so. In particular, his claim under § 1983 was that Defendants' actions violated his rights under the First Amendment, and his § 1985 claim was under that statute's prohibition against conspiracies "to deter, by force, intimidation, or threat, any . . . witness in any court of the United States . . . from testifying . . . or to injure such . . . witness in his person or property on account of his having so . . . testified." 42 U.S.C. § 1985(2). On Defendants' motion to dismiss, the district court held that the two-year statute of limitations applicable to 42 U.S.C. §§ 1983 and 1985 barred all claims resulting from actions preceding June 9, 2009. *See* Mem. & Order, *Seifert v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, No. 11-2327-JTM, 2012 WL 2448932, at *5–7 (D. Kan. June 26, 2012). Thereafter, the district court granted Defendants summary judgment on the remainder of Plaintiff's claims. *See Seifert*, 2013 WL 2631632, at *14.

**II. DISCUSSION**

We hold that under *Lane v. Franks*, 134 S. Ct. 2369 (2014), Plaintiff's testimony was protected by the First Amendment; that there is a triable issue of fact about whether Plaintiff was removed from investigations and had his commission revoked because of his testimony in *Bowling*; and that the Unified Government is potentially liable because

13

the actions of Sheriff Ash represented municipal policy. On the other hand, we hold that Sheriff Ash and Undersheriff Roland are entitled to qualified immunity on Plaintiff's § 1983 claim because when they acted the law was not clearly established that Plaintiff's testimony was protected by the First Amendment. As for Plaintiff's § 1985 claim, we hold that a triable issue of fact exists about whether Defendants conspired both to remove Plaintiff from investigations and to revoke his commission because of his testimony. (Ash and Roland have not raised a qualified-immunity defense to this claim.) Finally, we hold that Plaintiff's state-law claim fails because an adequate remedy exists under federal law.

## A.    Standard of Review

We review the district court's grant of summary judgment de novo. *See Veile v. Martinson*, 258 F.3d 1180, 1184 (10th Cir. 2001). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Under this standard, we view the evidence and draw reasonable inferences in the light most favorable to the nonmovant." *Id.*

## B.    First Amendment Claim under 42 U.S.C. § 1983

Under 42 U.S.C. § 1983, a plaintiff is entitled to recover damages from a person acting under color of state law who violates his constitutional rights. Plaintiff has sued Defendants for infringing his First Amendment rights. As a reserve deputy he enjoyed First Amendment rights, but not to the same extent as a private citizen. Because

14

"[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions," *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), not every restriction on a public employee's speech amounts to a deprivation of First Amendment rights. "[T]he First Amendment protection of a public employee's speech depends on a careful balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane*, 134 S. Ct. at 2374 (brackets and internal quotation marks omitted).

We apply what we have termed the *Garcetti/Pickering* test, *see Garcetti*, 547 U.S. 410; *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), to First Amendment retaliation claims by government employees. The test has five elements:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (internal quotation marks omitted). The first three elements are typically questions of law (though they can turn on disputed issues of fact), while the last two are typically questions of fact. *See id.* Defendants dispute the first, fourth, and fifth elements.

15

### 1.    Element One: Employee Official Duties

We must first determine whether Plaintiff's testimony was protected speech. *Garcetti* holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The official-duties question is a practical one that turns on "whether the speech was commissioned by the employer," *Thomas v. City of Blanchard*, 548 F.3d 1317, 1323 (10th Cir. 2008) (internal quotation marks omitted), and "reasonably contributes to or facilitates the employee's performance of the official duty," *id.* at 1324 (internal quotation marks omitted); *see Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007) (speech activities not protected because they "stemmed from and were the type of activities that [the employee] was paid to do").

The special case of employee testimony was recently addressed by the Supreme Court in *Lane*. Lane, the director of a youth program sponsored by a community college, had discovered that one of the program's employees had been drawing a salary despite not reporting to work. *See Lane*, 134 S. Ct. at 2375. He fired the employee, then testified against her before a federal grand jury and at her federal public-corruption trials. *See id.* Thereafter, he was fired, allegedly because of his testimony against the employee. *See id.* at 2376. The Supreme Court reinstated Lane's § 1983 suit against his employer, holding that "the First Amendment . . . protects a public employee who provided truthful sworn

16

testimony, compelled by subpoena, outside the course of his ordinary job responsibilities." *Id.* at 2374–75.

> In general, said the Court, testimony is a duty performed as a citizen:
>
> > Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason:  Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth.  When the person testifying is a public employee, he may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner.  But any such obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth.  That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee.

*Id.* at 2379 (citations omitted).  Moreover, the Supreme Court's "precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id.*  And that rationale is "especially evident" in a case like *Lane*. *Id.* at 2380.  It involved "the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment." *Id.*  To refuse First Amendment protection under such circumstances "would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs." *Id.*

Nevertheless, the Court did not hold that all testimony is protected.  It did not address "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties." *Id.* at 2378 n.4; *see also*

17

*id.* at 2384 (Thomas, J., concurring) ("For some public employees—such as police officers, crime scene technicians, and laboratory analysts—testifying is a routine and critical part of their employment duties."). Rather, the Court concluded:

> [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Id.* at 2379.

Here, Plaintiff's testimony was protected speech. It concerned his work but was not part of it. Although Defendants assert that testifying was a routine part of Plaintiff's job as a reserve deputy, they cite no supporting evidence. And the testimony he gave at the *Bowling* trial was nothing like the routine testimony of law-enforcement agents in support of criminal prosecutions. Plaintiff testified for a private party, not his public employer; in a civil lawsuit, not a criminal prosecution; against law-enforcement entities, not for them; and in compliance with a subpoena, not an employer mandate. His testimony was not among "the type of activities that [he] was paid to do." *Green*, 472 F.3d at 801; *see Morales v. Jones*, 494 F.3d 590, 598 (7th Cir. 2007) ("Being deposed in a civil suit pursuant to a subpoena was unquestionably not one of [police officer] Morales' job duties because it was not part of what he was employed to do."); *see also id.* at 603 (Rovner, J., concurring in part and dissenting in part) ("There is nothing in the record below to suggest that the deposition testimony was work that Lt. Morales was expected to perform as part of his formal or informal job duties, that it was conducted

18

pursuant to his job duties or at his employer's behest, that it was work product of the police department, that it was official speech, or that it was one of the tasks he was paid to perform."). Plaintiff has satisfied the first element of the *Garcetti*/*Pickering* test.

### 2. Element Four: Motivating Factor

Defendants do not contest that Plaintiff has met elements two and three of the *Garcetti*/*Pickering* test, so we move on to the fourth element: "whether the protected speech was a motivating factor in the adverse employment action." *Trant*, 754 F.3d at 1165 (internal quotation marks omitted). Plaintiff argues that he has provided sufficient evidence that both his removal from investigations and the revocation of his commission were motivated by his testimony in *Bowling*. We discuss each in turn.

### a. Removal from Investigations

Plaintiff has presented sufficient circumstantial evidence that his speech was a motivating factor in his removal from investigations. According to him, he was called into Roland's office on June 11, 2009, and told he could no longer work on investigations. Roland said that he and Sheriff Ash had met with DA Gorman, and Gorman had informed them that because of Plaintiff's credibility issues, he could not testify in federal court and Gorman's office would not accept any cases in which Plaintiff's name appeared. Plaintiff asked why the federal court's *Elam* order prevented his testimony in state court, when he had testified in state and municipal court numerous times since *Elam*'s issuance in 1998. Roland responded that Gorman had just learned, 11 years after the fact, that *Elam* prevented Plaintiff's state-court testimony. Roland also

19

stated that he had spoken with AUSA Morehead as well, that she did not consider Plaintiff credible, and that she was going to send Roland a copy of the *Elam* order.

A reasonable factfinder could be dubious of the *Giglio* explanation. In *Giglio* the defendant forged money orders and his coconspirator, a bank teller, supplied a signature card and processed the money orders. *See* 405 U.S. at 151. The teller, obviously the key witness in the case, was promised by a prosecutor that he would not be prosecuted if he testified against Giglio, but the defense was never informed about this arrangement. *See id.* at 152–53. At trial the teller denied that he had been told he would not be prosecuted. *See id.* at 151–52. The Supreme Court reversed and remanded for a new trial because the prosecution had not disclosed the promise of immunity. *See id.* at 153–55. It observed that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" will require a new trial. *Id.* at 154 (internal quotation marks omitted). It held that this was certainly the case in Giglio's trial:

> Here the Government's case depended almost entirely on [the teller's] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The teller's] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id.* at 154–55.

The immunity agreement in *Giglio* was relevant, admissible evidence because it provided a motive for the witness to lie or embellish. It would be powerful evidence to

20

impeach the government's chief witness. In contrast, if the prosecution saw fit to disclose to defense counsel the judge's order in *Elam* or was ordered to do so by the trial judge (we need not consider the propriety of such an order), the defense could do little with it. At most, the order discloses that Plaintiff had lied in court more than 10 years before he was removed from investigations. A prior lie would suggest that his character trait of veracity was questionable. (Judges, including members of this court, take a *very* dim view of perjury.) But there are strict limits on using a prior lie to impeach the veracity of a witness.

The order itself (or testimony about what the judge said) would not be admissible in federal court. *See* Fed. R. Evid. 608(b) ("[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."). An attorney cross-examining Plaintiff could only ask about the alleged dishonest act and would be "stuck with" his answer, even a denial. *United States v. Frost*, 914 F.2d 756, 767 (6th Cir. 1990) (internal quotation marks omitted); *see* Fed. R. Evid. 608(b) ("[T]he court may, on cross-examination, allow them [(acts suggesting a bad character for truthfulness)] to be inquired into . . . ."). (We note that at the *Bowling* civil trial, Plaintiff denied that he had lied in the *Elam* case.) And the alleged lie was an old event; even convictions are not routinely admitted for impeachment after 10 years. *See* Fed. R. Evid. 609(b). We question whether a federal court would have permitted cross-examination on such an old statement, particularly in light of the more recent ringing endorsement of Plaintiff's character for truthfulness by

21

the federal judge in *Bowling*. *See United States v. Woodard*, 699 F.3d 1188, 1195 (10th Cir. 2012) (whether witness can be cross-examined regarding past judicial credibility determination depends in part on "how much time ha[s] elapsed since the lie was told and whether there ha[s] been any intervening credibility determination regarding the witness" (internal quotation marks omitted)).

Moreover, it is doubtful that Plaintiff would be testifying in a federal prosecution. Ash and Roland both testified that they could not recall any instance in which an investigation involving a reserve deputy went to federal court. In short, the alleged *Giglio* problem with Plaintiff's testifying in federal court was both minimal and irrelevant.

As for state court, the Kansas rules of evidence not only prohibit the introduction of extrinsic evidence of a prior lie (as in federal court), but even prohibit cross-examination on the subject. *See* Kan. Stat. Ann. § 60-422 (West 2008) ("As affecting the credibility of a witness . . . evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."); *State v. Patton*, 120 P.3d 760, 788 (Kan. 2005), *disapproved of on other grounds, State v. Gunby*, 144 P.3d 647, 658–59 (Kan. 2006). Further, Roland testified that it was Morehead's *Giglio* concern, not anything Gorman said, that caused the removal of Plaintiff from investigations:

> Q. And after reviewing that order [in *Elam*], you made a determination that Max had a problem with regard to *Giglio*?

22

A.  I didn't . . . say he had a problem with *Giglio*.  We had . . . an issue with what the prosecutor saying, you know, they—they didn't want to take cases from him.

Q.  And by "they" you mean Terra Morehead and Jerome Gorman?

A.  Specifically Terra.

Aplt. App., Vol. VI at 1310.

Gorman testified that he never said he would refuse to use Plaintiff as a witness but would only *consider* the *Giglio* issue.  This is consistent with his endorsement of a memorandum sent to him a month before Plaintiff's removal from investigations, which said that *Giglio* would not typically apply to officer testimony.  And Gorman's chronology of events places his *Giglio* concern with Plaintiff as arising months after Plaintiff had been removed from investigations.

Additionally, a jury could question the *Giglio* rationale because Defendants disregarded Roland's similar "*Giglio*" issue.  *See Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158–59 (10th Cir. 2008) (inference of discrimination could be drawn from employer's harsher treatment of plaintiffs than other similarly situated employees).[1]  In 1996 the same judge who authored *Elam* two years later wrote *United States v. Aguilar*, No. 96-20032-01, 1996 WL 772584, at *2 n.6 (D. Kan. Dec. 20, 1996), in which she

---

[1] Defendants assert that at the same time they learned of concerns about Plaintiff, they also discovered that another deputy had committed misconduct years earlier and removed her from investigations as well because of *Giglio* concerns.  But the June 28, 2009 letter from Roland to Gorman informing him of the WCSD's intention to remove the deputy from investigations never mentions *Giglio*.

23

questioned Roland's credibility; yet he was never "*Giglioed*." Both Ash and Roland acknowledged the similarities between *Aguilar* and *Elam*. Yet Ash would not question Roland's credibility and Roland testified that no prosecutor, including Gorman and Morehead, had ever advised him that he would have problems as a witness and that he had testified in federal court after *Aguilar* was issued.

Defendants suggest that the different treatment of Roland was justified because prosecutors never raised concerns about Roland's potential *Giglio* issue; but that is beside the point. Roland himself was surely aware of the issue, and one can question his motives in taking action against Plaintiff on a ground that he thought inconsequential in his own case.

In sum, a jury could reasonably infer that the *Giglio* issue was not the true reason that Plaintiff was removed from investigations less than a week after the Unified Government settled Bowling's claims against it. The issue could reasonably be perceived by a jury as a quickly concocted excuse that could not withstand scrutiny if Defendants had any interest in fairly deciding whether the *Elam* order would pose a problem for testimony by Plaintiff.

Defendants nonetheless contend that they could not have been motivated by retaliation when removing Plaintiff from investigations in June 2009 because no one in authority knew that he was going to testify in Bowling's March 2010 trial. But the evidence they cite in support is hardly compelling. Ash stated that he did not pay much attention to the Bowling incident and that the extent of his knowledge of Plaintiff's

24

involvement was that Plaintiff believed that Bowling's allegations of excessive force should be pursued. But Ash also said that while he was at the police department before becoming sheriff, officers would talk about the *Bowling* case (criminal and civil) during and after roll call because it was "a big case . . . [a] controversial case." Aplt. App., Vol. VII at 1643. He described the talk as a "rumor mill running rampant." *Id.* at 1644. One could infer that the talk would continue throughout the *Bowling* proceedings and that, given the nature of the case and Plaintiff's prior testimony at the criminal trial, any officer would naturally assume that he would be a witness. Indeed, Ash never testified that in June 2009 he had not heard that Plaintiff was going to be a witness helpful to Bowling. As for Roland, his alleged recollection of the chronology could be questioned. He testified that he had heard nothing about the case until he read a news report about the verdict, but Plaintiff's attorney had sent him a letter in December 2009 (months before the verdict) noting Plaintiff's expected role in the upcoming trial.

Further, the Unified Government agreed to settle the claims against it on June 5, 2009. A jury could reasonably infer that the settlement would create news reports and discussion in the law-enforcement community about the case. And it could further infer that it was no coincidence that Plaintiff's removal from investigations was only six days later, especially when the ostensible reason was a court order (in *Elam*) that had never been mentioned in the 11 years before. The evidence is sufficient to satisfy the fourth element of *Garcetti*/*Pickering*.

### b. Revocation of the Commission

We turn next to the revocation of Plaintiff's commission. In district court Defendants questioned whether Plaintiff had a commission to be revoked. They argued that Plaintiff's commission had already been revoked by operation of law when Ash was elected sheriff, because "all appointments [of special deputies] made by a sheriff . . . shall automatically be revoked at the time that such appointing sheriff's service as sheriff concludes," Kan. Stat. Ann. § 19-805a (West 2008), and Ash never formally reappointed Plaintiff. Defendants have abandoned this issue on appeal, however, stating only that "[w]hether plaintiff actually held a commission is an open question." Aplee. Br. at 9 n.1; *see also id.* at 33, 35 (briefly mentioning the issue in general terms). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (internal quotation marks omitted).

But even if we were to consider this issue, we would affirm the district court. It rejected Defendants' argument, observing that the Kansas statute sets out no formal mechanism for reappointing reserve deputies and holding that a fact issue remained on whether Ash reappointed Plaintiff. *See Seifert*, 2013 WL 2631632, at *5. The WCSD continued to list Plaintiff as a reserve deputy four months after Ash took office, and Ash himself testified that when he took office he "assumed that the reserve officers who were appointed by my predecessor . . . continued in service as reserve officers." Aplt. App.,

26

Vol. VII at 1691. There is at least a fact question whether Plaintiff retained his commission after Ash's election.

Assuming that Plaintiff had a commission, we address his claim that it was revoked on April 13, 2010, in retaliation for his testimony at the *Bowling* trial the month before. Defendants respond that their motive was pure: he was relieved of his commission because he refused to work in the county jail, a requirement imposed on all reserve deputies at that time because of a shortage of workers at the facility. Sheriff Ash testified: "I told the undersheriff, 'If [Plaintiff] wants to retain his reserve commission, he can retain his reserve commission. I don't have a problem with that, but he'll have to fall in with all the other reserves [by working in the jail].'" Aplt. App., Vol. VII at 1649. According to Ash, "Max said, no, I have a concern about working in the jail," *id.*, and that was what prompted the issuance of the April 13 memorandum terminating his commission. Undersheriff Roland ended up giving the same explanation. At first he testified that Plaintiff's commission was revoked because "he had failed to attend meetings or training but—I'm—and I may be mistaken on that but it was—it was a—lack of him not the [sic] performing hours." *Id.*, Vol. II at 522. Roland then said, however, "[W]e had a conversation, Max and I, and about him being a reserve and . . . we told him that he was informed that he could remain a reserve but he'd have to work in the jail like the rest of the guys were doing." *Id.*

But there is sufficient evidence for a reasonable factfinder to believe that this explanation is pretextual. To begin with, the reason that Defendants now give was not

27

the reason given at the time. The memorandum given to Plaintiff by Sergeant Thaxton on April 13 says in full:

> Your Service as a Reserved Deputy is no longer needed at this time. Your tenure as a Reserve for the Wyandotte County Sheriff's Office has been greatly appreciated. This is an Administrative action; please address all concerns or questions to the Undersheriff Larry Roland.
>
> Please return all agency issued items including your commission card to me the Reserve Unit Coordinator.

*Id.*, Vol. V at 1003. At his deposition Thaxton delivered a telling account of how the memorandum was generated:

> [W]hen I was told to terminate [Plaintiff] from the reserve program, I couldn't understand it. I just thought I could use him a lot for training and we can just keep him in training.
>
> And so when I asked the Undersheriff, I said, "What am I going to terminate him for," because I know that he would comply with whatever we told him to, . . . and he says, something about the Fair Standards Labor [sic] Act where you can't be employed by a company and then do free labor for them. So . . . I said, "Where is that in there for my educational purposes?" He says, "Go ask Major Eickhoff," so I went and I asked Major Eickhoff and Major Eickhoff says, "Ask the Undersheriff."
>
> . . . .
>
> . . . I said, "I already did. He told me to ask you," and then he says, "Just tell Max this is an . . . administrative decision and if he has any questions he can speak to the Undersheriff directly."
>
> So that's what I did. I wrote it up similar to that conversation. . . .
>
> [W]hen I handed it to [Max], I could see that Max was a little disturbed about it and . . . I just said, "I feel like it's bullshit too."

*Id.* at 1013. Defendants do not attempt to justify the FLSA explanation. Instead, they argue, curiously, that "there is no evidence that the FLSA had any influence on [Sheriff]

28

Ash's decision that plaintiff could not work investigations or had to work in the jail to have a reserve commission," Aplee. Br. at 15, as if that point helped their cause. But if the FLSA was not the reason for the revocation of Plaintiff's commission, then its invocation suggests pretext.

Plaintiff acknowledges having a conversation about working in the jail, but he says that the conversation was months after his commission was revoked. According to Plaintiff, in late July or early August 2010 he was called into Roland's office, where Roland told him that, at the urging of an attorney for the Unified Government, Roland was offering him his commission back if he would work in the jail. Plaintiff refused. Roland would not entertain Plaintiff's request for an alternative arrangement, nor would he listen to (or contradict) Plaintiff's complaints about being mistreated because of his testimony in the *Bowling* case.

In our view, a jury could infer an improper motive for the revocation of Plaintiff's commission because the explanations given by Defendants at the time of the revocation (the FLSA) and in their depositions (refusal to work in the jail) are dubious. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1038–39 (10th Cir. 2011) ("A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." (brackets and internal quotation marks omitted)); *see NLRB v. Henry Colder Co.*, 907 F.2d 765, 769 (7th Cir. 1990)

29

("Shifting explanations for [adverse employment action] may, in and of themselves, provide evidence of unlawful motivation.").

Further, a jury could have inferred retaliation from the timing of events. Plaintiff testified in the *Bowling* civil case on March 4 and March 9, and the trial concluded on April 8. His commission was revoked five days later. The short time between Plaintiff's testimony and the adverse action supports an inference of retaliatory motive. *See Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) ("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation . . . .").

Plaintiff has presented sufficient evidence to support a finding in his favor on this element of his claim.

### 3.      Element Five: But-For Causation

We can now turn to the fifth step of the *Garcetti/Pickering* analysis:

> [I]f the employee establishes that his or her protected speech was a motivating factor in the adverse employment decision, the burden then shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity.

*Trant*, 754 F.3d at 1167 (internal quotation marks omitted). Again we first consider Plaintiff's removal from investigations and then the revocation of his commission.

Defendants contend that whatever their motives they would have had to remove Plaintiff from investigations in any event because prosecutors would not take cases in which he had been involved. But there is evidence that the view of the federal

30

prosecutors was not consequential because neither Ash nor Roland could recall a reserve deputy ever having testified in a federal proceeding. And as for state prosecutions, there is evidence that the district attorney did not raise a *Giglio* issue until months after Plaintiff was removed from investigations and even then said only that the *Elam* order would be something to consider on a case-by-case basis. A jury could rationally decide that Plaintiff would not necessarily have been removed from investigations.

Defendants have a better argument regarding the revocation of Plaintiff's commission, because the uncontradicted testimony is that at some point all reserve deputies were required to work in the jail and Plaintiff refused to do so. But both Plaintiff and Sergeant Thaxton testified that it was only after the revocation that Defendants offered to reinstate Plaintiff if he would work in the jail. Such an offer could serve to mitigate Defendants' damages, but it would not negate Plaintiff's cause of action. *See Giandonato v. Sybron Corp.*, 804 F.2d 120, 125 (10th Cir. 1986). Summary judgment based on the fifth element was inappropriate.

Thus, Plaintiff has presented sufficient evidence for a jury to find that he has suffered damages because of a violation of his First Amendment rights by Ash and Roland. It does not necessarily follow, however, that the Defendants are liable to him under § 1983. We now turn to (1) whether the Unified Government is liable and (2) whether Ash and Roland are personally liable.

### 4. The Unified Government's Liability

A local government is not liable for every constitutional violation by one of its officers or employees. "Under Section 1983, municipalities cannot be held liable for the actions of others under the common law principle of *respondeat superior*; they are responsible only for their *own* actions." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007). Under this standard, "a municipality is responsible for both [1] actions taken by subordinate employees in conformance with preexisting official policies or customs and [2] actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality." *Id.* at 1285 (emphasis omitted); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (municipal liability can arise from those "whose acts or edicts may fairly be said to represent official policy" (internal quotation marks omitted)).

Here, it appears that the actions of Sheriff Ash, in his position as the final policymaker for the Wyandotte County Sheriff's Department, represent the official policy of the Unified Government and subject it to potential liability. *See* Kan. Stat. Ann. §§ 19-805 (West 2008) (sheriff is responsible for conduct of undersheriff and deputies); *Bd. of Cnty. Comm'rs v. Nielander*, 62 P.3d 247, 251 (Kan. 2003) ("[T]he sheriff is a state officer whose duties, powers, and obligations derive directly from the legislature and are coextensive with the county board."). Plaintiff argues as much, and the Unified Government offers no argument in response. We therefore need not consider whether the actions of Ash and Roland were in conformity with preexisting official policies or

32

customs. The summary judgment for the Unified Government on the § 1983 claim must be set aside.

### 5. Qualified Immunity

We affirm, however, the summary judgment for Ash and Roland on the § 1983 claim. Both are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Only individuals, not governmental entities, can assert qualified immunity. *See Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). "When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." *Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000) (internal quotation marks omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Stewart v. Beach*, 701 F.3d 1322, 1331 (10th Cir. 2012) (internal quotation marks omitted).

We focus on the first element of the *Garcetti/Pickering* test. Was the law clearly established in 2009 and 2010, when Ash and Roland committed the alleged misconduct,

that testimony by a law-enforcement officer about matters observed while on duty could be protected by the First Amendment?  We think not.  The Supreme Court did not address the specific issue before *Lane* was handed down in June 2014, neither did we, and in 2010 other circuits were divided.  *Compare Reilly v. City of Atlantic City*, 532 F.3d 216, 231 (3d Cir. 2008) (a police officer's testimony is categorically protected), *with Huppert v. City of Pittsburg*, 574 F.3d 696, 707–08 (9th Cir. 2009) (testimony is part of officer's duties), *overruled by Dahlia v. Rodriguez*, 735 F.3d 1060, 1063 (9th Cir. 2013) (en banc), *and Green v. Barrett*, 226 F. App'x 883, 886 (11th Cir. 2007) (per curiam) (testimony by jailer not protected).  Indeed, the reason given by the Supreme Court to grant certiorari in *Lane* was "*to resolve discord among the Courts of Appeals* as to whether public employees may be fired—or suffer other adverse employment consequences—for providing truthful subpoenaed testimony outside the course of their ordinary job responsibilities."  134 S. Ct. at 2377 (emphasis added).  And *Lane* held that the individual defendant in that case was entitled to qualified immunity because "no decision of this Court was sufficiently clear to cast doubt" on controlling lower-court precedent.  *Id.* at 2381.  We hold that Ash and Roland did not have "reasonable warning that [their] conduct . . . violated constitutional rights" and are therefore entitled to qualified immunity.  *Stewart*, 701 F.3d at 1331 (internal quotation marks omitted).

C.    **Conspiracy Claim under 42 U.S.C. § 1985**

Plaintiff brings his second claim under 42 U.S.C. § 1985, which protects witnesses from retaliation.  It provides in relevant part:

> If two or more persons in any State or Territory conspire *to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying* to any matter pending therein, freely, fully, and truthfully, *or to injure such party or witness in his person or property on account of his having so attended or testified . . .* the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Id.* § 1985(2)–(3) (emphasis added). The district court held that Plaintiff had failed to present evidence of a conspiracy to either deter him from testifying or injure him after the fact. *See Seifert*, 2013 WL 2631632, at *11–12. Plaintiff disagrees, arguing that Ash and Roland conspired (1) to deter his testimony by removing him from investigations and (2) to injure him for testifying by revoking his commission.

We have already ruled that there was sufficient evidence that Ash and Roland took action (removal from investigations and revocation of his commission) to deter Plaintiff from testifying and to punish him for doing so. That there is sufficient evidence they acted in concert is a simple, even necessary, logical progression from that ruling. Because Defendants have not raised any defenses under § 1985 relating to municipal liability or qualified immunity, we need not address these matters.

### D.    State-Law Claim

Finally, Plaintiff appeals the district court's dismissal of his state common-law claim for retaliatory employment action in violation of Kansas public policy. The district court correctly recognized that under Kansas law a "state claim for retaliatory discharge is suspended if there is 'a state or federal statute which provides an adequate alternative

35

remedy.'" *Seifert*, 2013 WL 2631632, at \*13 (quoting *Flenker v. Willamette Indus.*, 967 P.2d 295, 299 (Kan. 1998) (brackets omitted)); *see Tollen v. City of El Dorado*, No. 11-1182-JWL, 2012 WL 10353 (D. Kan. Jan. 3, 2012). Plaintiff argues that § 1983 may provide an adequate alternative remedy, but § 1985 does not. The argument puzzles us. State law does not require *two* adequate remedies. If § 1983 is adequate, what does it matter whether § 1985 is, too? We affirm the district court's dismissal of the state-law claim.

## III. CONCLUSION

We AFFIRM the dismissal of Plaintiff's state-law claims because federal law provides an adequate alternative remedy. We AFFIRM the qualified-immunity dismissal of the § 1983 claims against Sheriff Ash and Undersheriff Roland. In all other respects we REVERSE and REMAND for further proceedings. Plaintiff's Amended Motion for Leave to File Portion of Appendix Under Seal is GRANTED. The Clerk of the Court is directed to seal Volume VIII of the Appellant's Appendix, except for the document on pages 1755–57, which is referenced in this opinion. Plaintiff's motion to abate is moot.

36