# STATE OF MICHIGAN

# COURT OF APPEALS

KAREN HRAPKIEWICZ,

　　　　　Plaintiff-Appellee,

v

WAYNE STATE UNIVERSITY BOARD OF
GOVERNORS,

　　　　　Defendant-Appellant.

UNPUBLISHED
March 9, 2017

No. 328215; 330189
Wayne Circuit Court
LC No. 11-015709-CL

Before: WILDER, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

　　　　In these consolidated appeals involving a claim of age discrimination, defendant, Wayne State University Board of Governors (WSU), appeals as of right from two distinct judgments entered after a jury trial. In Docket No. 328215, WSU appeals the trial court's April 24, 2015 judgment in favor of plaintiff, Karen Hrapkiewicz, in the amount of $300,000 in damages. In Docket No. 330189, Hrapkiewicz appeals the trial court's subsequent October 29, 2015 judgment awarding Hrapkiewicz attorney fees of $261,180, costs of $4,403.98, and interest of $49,699.41. In both matters, we affirm.

## I. FACTUAL BACKGROUND

　　　　This case arises out of WSU's termination of Hrapkiewicz on February 28, 2011, when she was 62 years old, and Hrapkiewicz's allegation that her termination was motivated by age-related animus in contravention of the Elliott-Larsen civil rights act (ELCRA), MCL 37.2101 *et seq.* The WSU division in which Hrapkiewicz was employed was the Division of Laboratory Animal Resources (DLAR). At the time of her termination, Hrapkiewicz filled several roles within the DLAR: she was (1) the director of the DLAR's Veterinary Technology (Vet Tech) Program, which was a partnership between WSU and Wayne County Community College (WCCC), (2) a clinical veterinarian for the animals in the Vet Tech Program and "backup" veterinarian for other DLAR animals, and (3) a course instructor in the Vet Tech Program. For over 30 years, Hrapkiewicz's direct supervisor was Dr. Merlin Ekstrom, the senior director of the DLAR. Dr. Hilary Ratner served as the vice president of WSU's research division at the time of Hrapkiewicz's termination, overseeing roughly 300 research employees and reporting directly to the president of WSU. The associate vice president, Gloria Heppner, reported to Ratner, as did Antonio Yancey, the director of business affairs for the research division. Dr. Lisa Brossia, who

-1-

became the senior director of DLAR upon Ekstrom's retirement, reported to Heppner. Susan Dibbley was supervised by Hrapkiewicz. Mildred Fuller was employed by WSU as a human resources consultant.

Over the years, Ekstrom consistently rated Hrapkiewicz's work as "excellent," but he also acknowledged that Hrapkiewicz acted disrespectfully towards others at times, had "interpersonal conflicts" with staff at WSU and WCCC, and was sometimes difficult to supervise. Aside from Ekstrom, several other WSU employees described Hrapkiewicz as a difficult coworker. Even so, Brossia testified that she saw Hrapkiewicz as part of the future of WSU and the DLAR.

In 2006, Ekstrom began planning his eventual retirement. Dr. Karen Rossman voluntarily retired in 2008. After "a national search," Brossia was hired to take Rossman's place. Ekstrom voluntarily retired in 2010. He was offered the option to retire two months early and take paid leave in the interim, which he accepted.

Thus, roughly four or five months before Hrapkiewicz was terminated, Brossia became the senior director of the DLAR and, accordingly, also became Hrapkiewicz's direct supervisor. On August 19, 2010, Brossia spoke with Yancey about creating a professional "development plan" for Hrapkiewicz to improve her performance, but Brossia never presented the plan to Hrapkiewicz.

At some time on or after December 14, 2010, Brossia instructed Hrapkiewicz to stop selling class syllabi to students and retaining the funds generated as petty cash, which was common practice among Vet Tech instructors. Brossia never disciplined Hrapkiewicz or any other instructor for selling class syllabi.

A "snow day" incident involving Hrapkiewicz occurred on the afternoon of February 1, 2011. Despite knowing that both WSU and WCCC were closed due to inclement weather, Hrapkiewicz allowed WCCC students to remain on campus for an exam. Hrapkiewicz also told students who were not yet on campus that they could "show up" for the exam. Subsequently, a police officer was dispatched to order Hrapkiewicz and the students to leave campus. Brossia discussed the snow day incident with Hrapkiewicz the next day and met with Yancey to discuss it the following week.

By February 23, 2011, WSU had decided to "separate" Hrapkiewicz from her employment. Brossia, Heppner, and Ratner all agreed that the ultimate termination decision was made by Heppner and Ratner, the latter of whom "was the final decision maker." At the time of Hrapkiewicz's termination, Ratner was 58 years old, Heppner was roughly 70 years old, Brossia was 37 years old, Fuller was either 64 or 65 years old, and Dibbley was 48 years old.

According to Ratner, Yancey[1] recommended Hrapkiewicz's termination, citing three reasons in support: (1) the snow day incident, (2) "classroom concerns,"[2] and (3) "financial irregularities" regarding the petty cash retained from Hrapkiewicz's sale of class syllabi. The snow day incident was "the most significant factor" in Hrapkiewicz's termination. Ratner neither conducted an independent investigation nor interviewed any witnesses, instead meeting with Yancey, Heppner, Brossia, and WSU counsel Linda Galante to discuss the allegations against Hrapkiewicz. The meeting attendees reached "consensus" about the termination decision, but Ratner was unable to recall whether Brossia ever recommended termination.

According to Ratner, Heppner, Yancey, and Brossia, Hrapkiewicz's age was never discussed or considered as part of the termination decision. Moreover, WSU never finalized its investigation regarding the petty cash issue because Hrapkiewicz was terminated before an audit could be conducted; thus, the financial irregularities issue played no part in the termination decision. Additionally, Heppner testified that he was unaware of the financial irregularities issue before the termination decision was made.

Heppner viewed the snow day incident as determinative because "it had the potential of actually putting students and faculty and other staff in danger" as they traveled to and from campus. Because WSU has so many faculty members—"probably a couple thousand"—it could not afford to have individual instructors exercising independent judgment about when to hold class despite a campus closure. Similarly, Ratner testified that she would have terminated Hrapkiewicz on the basis of the snow day incident alone. In Ratner's judgment, the incident "endangered [WSU] students' lives" and involved Hrapkiewicz's violation of both "University policy" and "direct orders from the University."

Hrapkiewicz was terminated February 28, 2011, at a meeting attended by Fuller, Brossia, and Yancey. When Hrapkiewicz asked the reason she was being terminated, Fuller told Hrapkiewicz there had been "several incidences of misconduct" but only referenced the snow day incident specifically. According to Yancey and Fuller, Hrapkiewicz was offered the option to retire in lieu of termination as a matter of standard WSU protocol. But Hrapkiewicz

---

[1] When asked at trial whether he recommended Hrapkiewicz's termination, Yancey responded, "It was my recommendation for the termination[.]" When questioned about inconsistent testimony given at his deposition, in which Yancey answered a similar question by responding, "It [the termination] was not my recommendation," Yancey explained that he was confused by the questions posed at the deposition: "there was a lot of confusion in terms of recommendation, termination, etcetera, and I got a little bit confused, but it was my recommendation. I'm very clear about that today." On the other hand, when asked whether Yancey recommended Hrapkiewicz's termination, Brossia explained that Yancey offered termination as an *option* but did not recommend it as the correct outcome. Brossia was unaware whether anyone else at WSU "recommended" Hrapkiewicz's termination.

[2] The "classroom concerns" issue involved Hrapkiewicz throwing an eraser at a student during class, evidently in a light-hearted manner.

-3-

characterized the situation as being "forced to retire," believing that her termination was motivated by age-related animus.

Hrapkiewicz's role as director of the Vet Tech program was assumed by Dibbley. The duties from Hrapkiewicz's role as clinical veterinarian were assumed by several people: Brossia, Dawe, and Rossman. Finally, Hrapkiewicz's teaching duties were divided between Brossia, Dibbley, and "some of the other already established part-time instructors."

Hrapkiewicz testified that in her last full year employed at WSU—2010—she earned wages of $111,000, and she was earning that same salary at the time she was terminated. She also received "health benefits, dental benefits, [] vision benefits," and matching contributions to her retirement savings account. After Hrapkiewicz was terminated, she tried but was unable to find "comparable employment." Given her age, she doubted that she would ever obtain such employment again. She was, however, able to obtain several part-time or adjunct teaching positions. Based on her former income, her present income, and her expected retirement age of 74, Hrapkiewicz estimated her economic damages from the allegedly wrongful termination to be "just a little bit" over $1 million.

Hrapkiewicz instituted this action by filing a complaint against WSU alleging that her termination was based on age-related animus in violation of the ELCRA. After answering Hrapkiewicz's complaint, WSU filed a motion for summary disposition under MCR 2.116(C)(10). WSU argued that Hrapkiewicz could not prove an essential element for a prima facie claim of age discrimination under the ELCRA for two reasons: (1) Hrapkiewicz could produce "absolutely no evidence that age was a factor in any employment-related decision" that WSU made regarding Hrapkiewicz, and (2) as a matter of law, Hrapkiewicz was not "replaced" by a significantly younger person because her duties were redistributed to various coworkers already employed by WSU and returning retirees who were older than Hrapkiewicz. In support of its motion for summary disposition, WSU appended several evidentiary exhibits, including deposition testimony in which Hrapkiewicz admitted that no WSU employee ever overtly told her that she was being terminated because of her age. Hrapkiewicz testified that, instead of such overt comments, Brossia made comments suggestive of age-related animus, specifically that Hrapkiewicz did things "in a set manner" and was "old school."

In response to WSU's argument that Hrapkiewicz was not "replaced" by a younger employee, Hrapkiewicz alleged that the younger Dibbley was "reassigned" to perform Hrapkiewicz's duties. After considering the matter, the trial court denied WSU's motion for summary disposition, reasoning that Hrapkiewicz had presented sufficient evidence to create a jury question. WSU subsequently sought and was denied leave to appeal the trial court's ruling on an interlocutory basis in this Court. *Hrapkiewicz v Bd of Governors of Wayne Statute University*, unpublished order of the Court of Appeals, entered March 31, 2015 (Docket No. 324207).

Thus, the case proceeded to a five-day jury trial, the testimony from which is summarized *supra*. At the close of Hrapkiewicz's proofs, WSU moved for a directed verdict, arguing that Hrapkiewicz had presented no evidence that age was a motivating factor in WSU's termination decision. After entertaining argument on the matter, the trial court denied WSU's motion for a directed verdict. The trial court reasoned, "the Court finds that [Hrapkiewicz] has presented a

-4-

sufficient amount of testimony to overcome a Motion for Directed Verdict at this time," further reasoning that it was a question of fact for the jury to determine whether there was evidence of age-related animus. Following deliberations, the jury returned a verdict form with the following findings: (1) that Hrapkiewicz had "proven by a preponderance of the evidence that her age was one of the motives or reasons for her discharge," (2) that Hrapkiewicz had "proven by a preponderance of the evidence that she ha[d] sustained damages due to [her] discharge," and (3) that Hrapkiewicz proved $300,000 of past economic damages but no future or noneconomic damages.

In response to the jury verdict, WSU filed a motion for JNOV or, in the alternative, a new trial. WSU argued (1) that Hrapkiewicz failed to establish a prima facie case of age discrimination at trial because she introduced no evidence "that any decision made regarding her employment was made on the basis of age," (2) that Hrapkiewicz's evidence regarding the allegedly pretextual reason for her termination was irrelevant given her failure to establish a prima facie case, (3) that Hrapkiewicz "had no reasonable expectation that her employment [with WSU] would continue beyond June 30, 2011, because her employment was contingent upon the execution of a new contract between" WSU and WCCC, (4) that, as such, Hrapkiewicz was unentitled to lost wage damages past June 30, 2011, and (5) that plaintiff admittedly failed to mitigate her damages. The trial court denied WSU's motion for JNOV.

Thereafter, Hrapkiewicz filed a petition seeking her costs and attorney fees pursuant to MCL 37.2802. After conducting two hearings on the matter, the trial court awarded Hrapkiewicz costs and attorney fees totaling $265,583.98.

These consoldiated appeals followed.

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision regarding motions for summary disposition, a directed verdict, or JNOV. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). With regard to summary disposition, "we must limit our review

to the evidence presented to the trial court at the time [the] motion was decided." *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 313 n 4; 660 NW2d 351 (2003).  On the other hand,

> [w]hen reviewing a trial court's decision on a motion for a directed verdict, this Court must view the evidence presented up to the point of the motion and all legitimate inferences from the evidence in the light most favorable to the nonmoving party to determine whether a fact question existed.  A trial court properly grants a directed verdict only when no factual question exists upon which reasonable minds could differ.  Similarly, a motion for JNOV should be granted only when there was insufficient evidence presented to create an issue of fact for the jury.  This Court must view the testimony and all legitimate inferences drawn from the testimony in the light most favorable to the nonmoving party.  If reasonable jurors could honestly have reached different conclusions, the jury verdict must stand.  [*Heaton*, 286 Mich App at 532 (quotation marks and citations omitted).]

## III. ANALYSIS

WSU first argues that the trial court erred by denying WSU's motions for summary disposition, a directed verdict, and JNOV.  We disagree.

> To establish a prima facie case of age discrimination, plaintiff must prove, by a preponderance of the evidence, that (1) she was a member of the protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a younger person.  [*Lytle v Malady*, 458 Mich 153, 177; 579 NW2d 906 (1998) (emphasis added).]

The final element—replacement by a younger person—is a prima facie element in both workforce reduction cases and those where workforce reduction is not at issue.  Compare *id.* (workforce reduction case) and *Major v Village of Newberry*, ___ Mich App ___; ___ NW2d ___ (2016) (Docket No. 322368) (denial of promotion case).

It is undisputed here that Hrapkiewicz was a member of a protected class because of her age, suffered an adverse employment action, and was qualified for her position.  Thus, the only prima facie element at issue is whether Hrapkiewicz was replaced by a younger person.

Unlawful discrimination may be proven using either direct evidence or indirect evidence. *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001).  "Direct" evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Id.* (quotation marks and citation omitted).  If no direct evidence exists, the plaintiff may survive summary disposition by producing indirect evidence of discrimination.  *Id.*  A plaintiff relying on indirect evidence need not *necessarily* resort to the *McDonnell Douglas* burden-shifting approach; rather, such a plaintiff can rely on traditional proofs and circumstantial evidence.  See *Matras v Amoco Oil Co*, 424 Mich 675, 683; 385 NW2d 586 (1986) ("Age discrimination may of course be proved under ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue . . . without resort to any special judicially created presumptions or inferences related to the

evidence. When this kind of direct or circumstantial proof is adduced, there is no need to employ the *McDonnell Douglas* presumption-based scheme.") (quotation marks, citations, and footnotes omitted; ellipsis in original). See also *Twigg v Hawker Beechcraft Corp*, 659 F3d 987, 1000 n 8 (CA 10, 2011) (explaining that "[m]any courts, including the Tenth Circuit, have sometimes conflated direct *evidence* with the direct *method of proof*," and observing that "courts sometimes conflate circumstantial *evidence* with the indirect *method of proof*.").

A plaintiff proceeding under the *McDonnell Douglas* framework must first prove the elements of a prima facie case. *Hazle*, 464 Mich at 463. If the plaintiff does so, a presumption of discrimination arises, which the defendant can rebut by "articulat[ing] a legitimate, nondiscriminatory reason for its employment decision[.]" *Id.* at 463-464. After the employer articulates such a reason, the burden shifts back to the plaintiff to "demonstrate that the evidence in the case, when construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.' " *Id.* at 465, quoting *Lytle*, 458 Mich at 176.

> The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision. The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [*Hazle*, 464 Mich at 466 (citations and footnote omitted).]

As a preliminary matter, we are unpersuaded by WSU's argument that Hrapkiewicz was not "replaced" because her duties were redistributed to other WSU employees. In support, WSU cites *Lytle*, 458 Mich at 178, in which our Supreme Court, quoting *Barnes v GenCorp Inc*, 896 F2d 1457, 1465 (CA 6, 1990),[3] held, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform plaintiff's duties." WSU fails to recognize that *Lytle* and *Barnes* are workforce reduction cases, and thus inapposite to this case (which involves no workforce reduction scenario). In other words, the portion of *Lytle* cited by WSU stands for the proposition that if a plaintiff is terminated as a result of a general workforce reduction—such as company-wide layoffs—that plaintiff is only "replaced" if another employee is hired or reassigned to perform the plaintiff's duties. See *Barnes*, 896 F2d at 1465 ("It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force

---

[3] Disagreement on other grounds as recognized by *Rinehart v City of Independence, Mo*, 35 F3d 1263, 1266 (CA 8, 1994).

reduction when he or she is replaced after his or her discharge."). Moreover, it is clear that Dibbley was "reassigned" to assume the majority of Hrapkiewicz's duties. Thus, Hrapkiewicz presented evidence that she was replaced by Dibbley—a younger person—thereby satisfying the final element for a prima facie case.[4]

After Hrapkiewicz established the prima facie elements for her claim of age discrimination, the burden shifted to WSU to articulate a legitimate, nondiscriminatory reason for terminating Hrapkiewicz. Although WSU's decision makers agreed that the snow day incident was the primary reason, various employees of WSU offered differing rationales for why Hrapkiewicz was terminated. Such rationales were sufficient to shift the burden of proof back to Hrapkiewicz. In concert with Hrapkiewicz's sterling record over many years of employment, however, WSU's inconsistent explanations *also* served as circumstantial evidence from which a rational trier of fact could reasonably infer that the snow day incident and other cited concerns were a mere pretext for unlawful age discrimination. See *Walker v Johnson*, 798 F3d 1085, 1092 (CA DC, 2015) ("A plaintiff may support an inference that the employer's stated reasons were pretextual . . . by citing the employer's . . . inconsistent or dishonest explanations). Accord *Foster v Mountain Coal Co, LLC*, 830 F3d 1178, 1194 (CA 10, 2016); *Castro v DeVry Univ, Inc*, 786 F3d 559, 577 (CA 7, 2015); *Seifert v Unified Gov't of Wyandotte Co*, 779 F3d 1141, 1158 (CA 10, 2015).

Thus, viewing all of the record evidence in the light most favorable to Hrapkiewicz as the nonmoving party, Hrapkiewicz presented sufficient evidence to create a genuine issue of material fact at the summary disposition stage. As such, WSU was unentitled to summary disposition. Similarly, at trial, Hrapkiewicz presented sufficient circumstantial evidence for a reasonable juror to find that age-related animus was a motivating factor in WSU's termination decision. Thus, the trial court properly denied WSU's motions for a directed verdict and JNOV.

WSU further argues that the trial court erred by failing, at the JNOV stage, to reduce the jury verdict on the basis that Hrapkiewicz had no reasonable expectation of employment with WSU after June 30, 2011. We disagree.

MCL 37.2801 "has been interpreted to include any damages which 'flow' from the discrimination," including "loss of wages, loss of pension rights and employee benefits, loss of seniority, and loss of employment." *Reisman v Regents of Wayne State Univ*, 188 Mich App

---

[4] In her motion for summary disposition, Hrapkiewicz did not cite to record evidence of Dibbley's age. But during the subsequent motion hearing, counsel for WSU indicated that Dibbley was 51 years old, and thus WSU was bound by its counsel's representation regarding Dibbley's age, see *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 455 n 1; 733 NW2d 766 (2006) (explaining that a party is bound by its attorney's representations to the trial court). Moreover, even assuming, arguendo, that the trial court erred by relying on counsel's representations about Dibbley's age, WSU cannot capitalize on any such error as a grounds for reversal here. See *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003) ("[E]rror requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence.").

526, 542; 470 NW2d 678 (1991). WSU argues that, because the jury award was for past economic damages, the verdict form "suggests" that the jury awarded Hrapkiewicz lost wages from her date of discharge until 2014. Although the verdict may be *suggestive* of that fact, it is not definitive. The jury's $300,000 verdict might have been based on the value of Hrapkiewicz's lost benefits. Furthermore, as the trial court recognized, given her age, Hrapkiewicz's discriminatory termination was particularly damaging. Her loss of seniority and employment just years before the ordinary retirement age may bar her from ever attaining similar employment again. Accordingly, the jury's verdict was supported by the evidence and must be permitted to stand.[5]

Finally, WSU argues that the trial court erred by awarding Hrapkiewicz costs and attorney fees under MCL 37.2802 ("A court, in rendering a judgment in an action brought pursuant to this article, may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant in the action if the court determines that the award is appropriate."). We disagree.

Hrapkiewicz's trial counsel, Michael Pitt, testified that he (1) has been a trial attorney for 41 years, (2) has handled "thousands of cases" and tried over 70 cases in both state and federal court, (3) has specialized in civil rights and employment law since 1980, (4) is a past president of the Michigan Trial Lawyers Association, (5) has written several book chapters related to civil rights and employment law, (6) has presented "40 or 50 seminars over the last 40 years on trial practice and employment law," (7) has received numerous awards, (8) has previously obtained multiple verdicts for his clients of more than $10 million, and (9) is the founder of his employment-law firm. Based on the most recent version of *Economics of Law Practice in Michigan*, which suggested an hourly fee of more than $500 per hour for local attorneys in the 95th percentile or higher, Pitt requested an hourly rate of $400 for himself,[6] $350 per hour for one of his partners who worked on the case, $275 per hour for his co-counsel at trial, and $110 per hour for paralegal services. Pitt opined that the $300,000 verdict received in this case supported the requested costs and fees, as did the "very challenging" nature of the case, the contingent nature of the fee agreement, the length of the jury trial, the interlocutory appeal in this Court, the number of witnesses and depositions, the "hundreds and hundreds" of pages of document review, and the duration of the representation (four and a half years).

---

[5] To the extent that WSU argues that the trial court "erred" by failing, at the JNOV stage, to reduce the jury verdict on the basis that Hrapkiewicz failed to mitigate her damages, WSU's argument is entirely unconvincing. We perceive no clear error in the trial court's finding that Hrapkiewicz properly mitigated her damages. On the contrary, the evidence indicates that Hrapkiewicz sought and obtained numerous positions after she was terminated but was unable to obtain similar employment. Indeed, given her age, it is difficult to see how Hrapkiewicz could "mitigate" her loss of seniority and benefits.

[6] Pitt had previously performed work for Hrapkiewicz on an hourly basis and had billed her $400 per hour for such work.

As a preliminary issue, to the extent that WSU seeks to argue on appeal that the trial court erred by accepting *argument* to substantiate the hourly rate of some of the attorneys who represented Hrapkiewicz—rather than requiring *testimony* from each attorney—WSU waived any such argument by assenting to the trial court's action below. "An affirmative expression of assent constitutes a waiver." *Nexteer Auto Corp v Mando America Corp*, 314 Mich App 391, ___; ___ NW2d ___ (2016). When the trial court suggested that, rather than having each attorney testify individually, the parties might summarize the relevant facts through argument, WSU's counsel replied, "I'm fine with that, Your Honor. I can argue the rest of it . . . I'm fine with them not taking the stand[.]" WSU's assent extinguished any error, thereby precluding appellate review. See *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 545; 854 NW2d 152 (2014).

Furthermore, we perceive no abuse of discretion in the trial court's award of costs and fees. "Michigan generally follows the 'American rule' regarding attorney fees, which provides that fees are not generally recoverable unless a statute, court rule, or common-law exception provides otherwise." *Silich v Rongers*, 302 Mich App 137, 147-148; 840 NW2d 1 (2013). The ELCRA provides statutory authorization for costs and fees at MCL 37.2802. "The purpose of [MCL 37.2802] is to encourage persons deprived of their civil rights to seek legal redress, to ensure that victims of discrimination have access to the courts, and to deter discrimination." *Meyer v City of Center Line*, 242 Mich App 560, 576; 619 NW2d 182 (2000). "A party must be a financially successful or prevailing party to be entitled to an award of fees and costs" under MCL 37.2802. *Id.* (quotations marks and citations omitted). "To be considered a prevailing party, a plaintiff must receive at least some relief on the merits of plaintiff's claim, such as an award of damages, an injunction, or a declaratory judgment on a favorable consent decree or settlement."

Here, Hrapkiewicz obtained a $300,000 judgment in her favor for age discrimination. Thus, she clearly qualifies as a prevailing party, and thus the trial court had discretion to grant her costs and attorney fees. In determining the reasonableness of requested fees, "a trial court should begin its analysis by determining the fee customarily charged in the locality for similar legal services." *Smith v Khouri*, 481 Mich 519, 530; 751 NW2d 472 (2008). The court should then consider the following two sets of nonexclusive factors, some of which overlap:

> (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client.

> * * *

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

> (3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent. [*Id.* at 529-530 (quotation marks and citations omitted).]

Trial courts routinely rely on "on data contained in surveys such as the Economics of the Law Practice Surveys that are published by the State Bar of Michigan." *Id.* at 531.

After duly considering the above factors and performing a thoughtful analysis, the trial court set differing hourly rates for each of Hrapkiewicz's attorneys. Although it granted Pitt his requested hourly rate, it reduced the rate of Hrapkiewicz's other attorneys. The trial court also individually considered each contested billing entry, reducing some, disallowing others, and approving the majority. Its conclusion in this regard was largely dependent on its decision that Pitt's testimony was credible. We will not second-guess that credibility determination. See *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997). We perceive no abuse of discretion in the trial court's award of costs and attorney fees. Plaintiff, being the prevailing party, may tax costs pursuant to MCR 7.219.

Affirmed.

/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh